Submitted January 25, affirmed July 23, petition for review denied
November 5, 2008 (345 Or 415)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## ROBERT GROVES,
aka Robert W. Groves,
aka Robert Wayne Groves,
*Defendant-Appellant.*

Multnomah County Circuit Court
040431757; A128167

190 P3d 390

Ingrid A. MacFarlane filed the briefs for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Christina M. Hutchins, Senior Assistant Attorney General, filed the briefs for respondent.

Before Landau, Presiding Judge, and Ortega, Judge, and Rosenblum, Judge.

ROSENBLUM, J.

**ROSENBLUM, J.**

Defendant was charged with breaking into a woman's apartment and sexually abusing and attempting to rape her and then, approximately 20 minutes later, breaking into another woman's apartment with the intent to rape her. A jury found defendant guilty of first-degree burglary (Count 3), ORS 164.225, first-degree sexual abuse (Count 1), ORS 163.427, and first-degree attempted rape (Count 2), ORS 163.375, based on the first incident and first-degree burglary (Count 5) and first-degree attempted rape (Count 4) based on the second incident. Defendant challenges the sufficiency of the evidence on Counts 4 and 5. He also contends that the trial court erred in ruling, under OEC 404(3), that evidence of the first burglary and attempted rape was admissible to prove defendant's identity, intent, and opportunity with respect to Counts 4 and 5. Defendant also challenges the imposition of consecutive sentences. We affirm.

We take the following facts from the record, viewing them in the light most favorable to the state. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994). In the early morning hours of April 17, 2004, Divine was sleeping in her third-story apartment in northeast Portland, where she lived alone. At approximately 3:30 a.m., she woke up to find defendant, who was a stranger to her, crawling onto her bed. Defendant pinned her to the bed with his body, but Divine struggled and was able to reach her telephone and call 9-1-1. Defendant knocked the phone from her hand. He reached under her shirt and grabbed her breast and then began pulling her pants down. Divine was able to break free enough to reach the phone, and she called 9-1-1 again. Defendant got up and quickly left the bedroom and then went out through the balcony door and down the fire escape. It appeared that he had entered the apartment the same way that he left it.

Moments later, the 9-1-1 operator told Divine that the police were at her apartment building and that she needed to open the door for them. Divine let the two officers in and described defendant to them. The officers told her to wait in her apartment. A few minutes later, they returned and said that other officers had found someone matching the

description she had given. They took her to a nearby convenience store where other officers were holding defendant. Divine readily identified him as her attacker. Approximately 20 minutes passed from the time the police were dispatched to Divine's apartment until defendant was stopped at the convenience store.

Meanwhile, after defendant had left Divine's apartment, but before he was stopped by the police, Thompson, who lived alone in a second-story apartment about eight blocks from Divine's apartment, awoke to the sound of the lock on her front door rattling. She thought that someone was trying to get into her apartment and got up to investigate. She then realized that the sound was coming from inside the apartment. Thompson screamed and kept moving toward the front door in order to get out. At the doorway to her bedroom, she saw a man about 10 feet from her. Thompson, who normally wears glasses or contact lenses but was not wearing them at the time, looked at him very briefly before running to the front door, unlocking it, and running out of the apartment. In the dim light, she saw only his profile. After getting out of the apartment, Thompson roused a neighbor, who called 9-1-1. Two neighbors went into her apartment and found that the window to the fire escape was broken and that whoever had been in the apartment was gone.

The police arrived nearly immediately. Thompson described the man she had seen in her apartment. The neighbor directly below Thompson's apartment reported that she had been awakened by Thompson's screaming and running and that she had then heard the fire escape dropping to the ground. The officers had heard the dispatch calls related to Divine's 9-1-1 call and knew that other officers were holding a suspect. They told Thompson that they wanted to see if she could identify him as the intruder in her apartment.

The officers took Thompson to the convenience store where Divine had identified defendant. It was just over one block from Thompson's apartment. They pointed out defendant to Thompson. She said that he was "consistent with" the man in her apartment, but she could not say positively that it was him.

Defendant was arrested and charged in connection with both incidents. Defendant told the police that he lived in the same neighborhood. He said that he had been at a nightclub earlier and that a friend had dropped him off at about 3:30 a.m. in a grocery store parking lot about 10 blocks from his home. The grocery store is two blocks from Divine's apartment. Defendant said that he was walking home after being dropped off when the police stopped him at the convenience store.

The police searched Thompson's apartment for evidence that defendant was the intruder. They found no fingerprint or DNA evidence at the apartment. However, they discovered a substance on defendant's pants that, according to an Oregon State Police forensic scientist, matched the paint on the fire escape at her apartment. They also found a small amount of DNA under one of defendant's fingernails. Although the sample taken was too small to yield an exact match, the DNA was consistent with Divine's.

Before trial, the state filed a motion to introduce "prior bad act" evidence under OEC 404(3). The state argued that the evidence of the offenses against Divine was admissible to show, among other things, defendant's intent, identity, opportunity, and plan with respect to the offenses against Thompson, and, likewise, that the evidence of the offenses against Thompson were admissible for the same purposes with respect to the offenses against Divine. The state also sought to introduce, for the same purposes with respect to all of the charged offenses, evidence that defendant had raped five women in the United Kingdom and had raped or attempted to rape two women in Georgia. The trial court ruled on the three groups of offenses separately—that is, it ruled on the admissibility of the offenses against Divine and Thompson first, then the offenses in Georgia, and then the offenses in the United Kingdom.

With respect to the offenses in Portland, the court concluded that the evidence of each incident was relevant to prove defendant's intent, identity, opportunity, and plan with respect to the other incident. It went on to conclude that the evidence of each incident satisfied the test for admissibility under OEC 404(3) to prove intent. It then ruled in turn

that the evidence of the incidents in Georgia and the United Kingdom were also relevant to prove intent, identity, opportunity, and plan.

The court did not rule that any of the evidence satisfied the test for admissibility to prove identity that was articulated in *State v. Pinell*, 311 Or 98, 109-10, 806 P2d 110 (1991). In fact, it specifically noted that it did not reach the conclusion that the various offenses were "signature crimes"—a prerequisite to admissibility for proving identity. *See id.* ("other crime" evidence is relevant to prove identity if the methodology is "attributable to only one criminal, that is, the methodology is distinctive so as to earmark the acts as the handiwork of the accused"); *State v. Johns*, 301 Or 535, 551, 725 P2d 312 (1986) (to prove identity, the prior acts must be a "signature" crime). It added, however, that case law establishes that prior bad act evidence is to be excluded only when it is offered solely for the purpose of establishing propensity and that, because that was not the state's purpose in this case, the evidence was admissible. It stated that, in its view, the evidence was inadmissible for specific purposes only if those purposes were not connected to relevant issues in the trial.[1] Defendant did not object.

The state ultimately did not introduce any evidence of the Georgia and United Kingdom offenses in the guilt phase of defendant's trial. However, in closing argument, the prosecutor told the jury that it could rely on evidence of the offenses against Divine in determining whether defendant had committed the offenses against Thompson:

"It happened so quick. Does that mean he intended to rape her? How do we know that? Well, let me tell you, this is how you know: You know because you know the facts here. You know how that went down.

"Those facts that relate to * * * Divine's circumstance, and you may consider those facts when you consider things

---

[1] The state asked whether the evidence would be admissible for noncharacter purposes besides the four that the court had identified, such as motive and knowledge. The court responded that, as it understood the case at that point, motive and knowledge would not be at issue and, thus, that the evidence was not relevant for those purposes. It added that, depending on what issues defendant raised in his defense, the evidence might become relevant for purposes other than intent, identity, opportunity, and plan.

like what was he intending to do there? You can consider these facts, not only when you try to tell me what was his intent in the second apartment, but who is he? Who is the man in the second apartment? His identity. You can consider what happened over here when you answer the question who was in [Thompson's] house. You can consider what happened at [Divine's] house when you consider did he operate under the same plan, did he have an opportunity to commit this crime, 20 minutes apart."

Defendant did not object to that argument.

The jury found defendant guilty on all counts.

Following the guilt phase of defendant's trial, the court held a sentencing hearing, after which the jury found defendant to be a dangerous offender. The court imposed 30-year indeterminate sentences on each of the five convictions. The court ordered defendant to serve all of the sentences consecutively. It concluded that the sentences on Counts 4 and 5 should be consecutive to those on Counts 1, 2, and 3 because the two groups of offenses involved different victims. With respect to the offenses against Divine, the court found that the attempted rape and the sexual abuse were not merely incidental to the burglary but rather indicated that defendant was willing to commit more than one offense. It made the same finding with respect to the second burglary and the attempted rape of Thompson. The court also found that each offense caused or created a risk of causing greater loss, injury, or harm to the victim than the other offenses. This appeal followed.

Defendant makes four assignments of error. In his first, he argues that the court erred in denying a motion for judgment of acquittal on Counts 4 and 5—the burglary and attempted rape of Thompson. Defendant contends that there is insufficient evidence that he was the intruder in Thompson's apartment or, assuming that it was him, that he intended to rape her.[2] In his second assignment, he argues

---

[2] A person commits burglary if he or she "enters or remains unlawfully in a building with intent to commit a crime therein." ORS 164.215(1). The indictment specifically alleges in Count 5 that defendant entered and remained in Thompson's apartment with the intent to commit rape. Thus, both Counts 4 and 5 required proof that defendant intended to rape Thompson.

that the trial court erred in ruling that the evidence of the offenses against Divine was admissible to prove identity, intent, and opportunity with respect to the offenses against Thompson. In his third and fourth assignments of error, defendant raises separate statutory and constitutional challenges to the imposition of consecutive sentences.

 We begin with defendant's first assignment of error. We review the denial of a motion for judgment of acquittal to determine whether there is evidence in the record from which a rational factfinder, viewing the evidence in the light most favorable to the state and drawing all reasonable inferences in the state's favor, could find the defendant guilty. *Cervantes*, 319 Or at 125. Although a factfinder may draw reasonable inferences from direct and circumstantial evidence, it may not engage in speculation or guesswork. *State v. Means*, 213 Or App 268, 272, 160 P3d 1001 (2007). We review all of the evidence admitted at trial, whether properly admitted or not, so our disposition of defendant's second assignment of error does not affect our review here. *State v. Rinkin*, 141 Or App 355, 359-60, 917 P2d 1035 (1996).

■ Defendant's argument that there is insufficient evidence that he was the intruder in Thompson's apartment requires little discussion. Within minutes of the intrusion, defendant was stopped by the police barely more than a block from Thompson's apartment. A substance found on defendant's pants matched the paint on the fire escape at Thompson's apartment, a fact that gives rise to a reasonable inference that defendant was on the fire escape. Although Thompson's sighting of the intruder was only fleeting and she was not wearing corrective lenses, she told the police and testified at trial that defendant's appearance was consistent with the man she saw in her apartment. Even without considering the evidence of the offenses against Divine, the jury could reasonably infer that defendant was the intruder.

■ We turn to defendant's argument that there is insufficient evidence that he intended to rape Thompson. Defendant notes that the intruder said nothing to Thompson and did not touch her. In fact, he asserts, the intruder did nothing at all beyond entering and leaving the apartment. He contends that the evidence gives rise to no inference regarding

intent. The state responds that defendant disregards some of the evidence in the record. Most importantly, the state points to the evidence of the offenses against Divine, arguing that, given the similarity of the circumstances and the closeness of the two incidents in time and location, the jury could infer that defendant entered Thompson's apartment with the same intent that he had in breaking into Divine's apartment.

We agree with the state. Viewed in the light most favorable to the state, the record shows that defendant broke into Divine's apartment and attempted to rape her. Given the circumstances, the jury could reasonably infer that, after Divine thwarted defendant's attempt to rape her by calling 9-1-1, he decided to try again at Thompson's apartment. It could thus infer that he entered the apartment with the intent to commit rape. We reject defendant's first assignment of error.

We turn to defendant's second assignment of error, in which he argues that the evidence of the offenses against Divine was inadmissible to prove intent, identity, and opportunity with respect to the offenses against Thompson. He argues that the offenses were not sufficiently similar to prove intent or sufficiently distinct to prove identity. With respect to opportunity, defendant argues only that the state's need for the evidence to prove opportunity was minimal and that its probative value was thus outweighed by the risk of unfair prejudice.

We do not understand defendant to argue that the evidence of the offenses against Divine was inadmissible at trial altogether. Such an argument would obviously not be well-taken: The evidence was admissible as direct evidence of the offenses charged in Counts 1, 2, and 3—that is, the offenses against Divine. Rather, we understand defendant's argument to be that, although the evidence was admissible for that purpose, its admissibility was limited—specifically, that it was not admissible for purposes of proving intent, identity, or opportunity. In other words, we understand defendant to argue that, although the evidence was properly before the jury, it was not proper to allow the jury to consider it for other issues in the trial. *Cf. State v. Phelps*, 73 Or App 68, 72, 698 P2d 43 (1985) (where evidence of a prior bad act

was admissible only to prove the defendant's knowledge, the defendant was entitled to an instruction limiting the jury's consideration of the evidence to that issue).

The problem with that argument is that it is unpreserved. As noted above, the trial court concluded that, because the state was not offering the evidence to establish propensity, it was admissible to the extent that it was relevant to any issue in the trial. The court went so far as to state expressly that it was not finding that the offenses were "signature crimes," but it nevertheless ruled that the evidence was admissible to prove identity. Defendant did not argue that, although the evidence was admissible for some purposes, it was nevertheless improper for the jury to consider it for *all* material issues in the trial.

■ To preserve an issue for appeal, a party must object with sufficient specificity that the court is able to identify and correct the asserted error. *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). The evidence at issue here was admissible at trial. Because defendant did not argue that the jury's consideration of it should be limited, the error that he asserts on appeal is unpreserved, and we do not consider it.

■ We turn to defendant's challenges to the imposition of consecutive sentences. In his third assignment of error, defendant argues on statutory grounds that the trial court erred in ordering that the sentences on Count 4—the attempted rape of Thompson—and Count 5—the burglary of Thompson's apartment—run consecutively to one another. Defendant argues, among other things, that the commission of the attempted rape was an incidental violation committed in the course of the commission of the burglary and that consecutive sentences were thus not authorized under ORS 137.123(5)(a).[3] He contends that both the burglary and the attempted rape—that is, the conduct constituting a substantial step toward the commission of rape—consisted of his

---

[3] ORS 137.123(5)(a) provides that a court has discretion to impose consecutive sentences if it finds that

"the criminal offense for which a consecutive sentence is contemplated was not merely an incidental violation of a separate statutory provision in the course of the commission of a more serious crime but rather was an indication of defendant's willingness to commit more than one criminal offense[.]"

entry into the apartment with the intent to commit rape. In his view, where multiple offenses are predicated on a single act, there is no evidence to support a finding that the defendant demonstrated a willingness to commit more than one offense.

Defendant is mistaken. He relies on our opinion in *State v. Warren*, 168 Or App 1, 5 P3d 1115, *rev den*, 330 Or 412 (2000), in which we reversed consecutive sentences on convictions for a first-degree assault and an attempted murder that were both predicated on the defendant's having shot the victim in the head once. But as we explained in *State v. Anderson*, 208 Or App 409, 421, 145 P3d 245 (2006), *rev den*, 343 Or 33 (2007), our conclusion in *Warren* was based on the fact that, on the record developed in that case, the intent to kill and the intent only to cause serious physical injury were mutually exclusive. In *Anderson*, we held that, under the circumstances in that case, the defendant's single act—striking the victim with a mallet—showed a willingness to commit both second-degree assault and first-degree robbery and thus supported imposition of consecutive sentences. *Id.* at 422-23. Here, as in *Anderson*, defendant's willingness to commit more than one offense can be inferred from his conduct. In short, the record supports the trial court's finding that defendant was willing to commit both burglary and rape. It follows that the court did not err in imposing consecutive sentences under ORS 137.123(5)(a).[4]

■ We turn to defendant's final assignment of error, which defendant made in a supplemental brief after the Supreme Court announced its decision in *State v. Ice*, 343 Or 248, 170 P3d 1049 (2007), *cert granted*, ___ US ___ , 128 S Ct 1657 (2008). In it, defendant again challenges the imposition of consecutive sentences on Count 4 and Count 5 relative to one another, but he also argues that the court erred in ordering him to serve the sentences on Counts 1, 2, and 3 consecutively to one another.[5] Defendant argues that the imposition of those consecutive sentences violated his right to trial

_____

[4] Because we conclude that the imposition of consecutive sentences was statutorily authorized under ORS 137.123(5)(a), we need not consider the court's alternative conclusion that such sentences were authorized under ORS 137.123(5)(b).

[5] Defendant does not argue that the court erred in imposing the sentences for the offenses against Thompson consecutively to the sentences for the offenses against Divine.

by jury under the Sixth Amendment to the United States Constitution. He concedes that this assignment of error is unpreserved, but he urges us to consider it as plain error.

We decline to do so. Assuming, without deciding, that the trial court erred and that the error is apparent on the face of the record, we must exercise cautious discretion in deciding whether to address the error. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991) ("A court's decision to recognize unpreserved or unraised error in this manner should be made with utmost caution."). Factors we consider in deciding whether to exercise our discretion to address an unpreserved error include the competing interests of the parties, the gravity of the error, and the ends of justice in the particular case. *Id.* at 382 n 6.

Under the circumstances, we conclude that such an exercise of our discretion is not warranted. In *State v. Ramirez*, 343 Or 505, 513, 173 P3d 817 (2007), the Supreme Court explained that, in determining whether to exercise our discretion to consider an unpreserved assignment of error based on a claimed infringement of the right to jury trial at sentencing, we must consider the state's interest in avoiding a pointless remand if there can be no real debate as to what findings a jury would make. Here, one question that would be put to a jury on remand is whether defendant showed a willingness to commit more than one criminal offense. An affirmative answer to that question would by itself authorize consecutive sentences under ORS 137.123(5)(a). In our view, the evidence that defendant was willing to commit more than one offense within each incident is overwhelming, and it is highly unlikely that, if we were to remand, a jury would find that any of defendant's offenses were "merely incidental" to any of the others. Under the circumstances, defendant's interest in a new sentencing hearing is essentially nonexistent. It follows that the ends of justice do not counsel in favor of exercising our discretion to consider defendant's unpreserved assignment of error.

Affirmed.