Submitted on remand from the Oregon Supreme Court May 28, reversed and remanded on Counts 1, 2, and 3; otherwise affirmed November 26, 2008

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## ALONZO DWIGHT GRAVES,
aka Anthony Leroy Robinson,
*Defendant-Appellant.*

Multnomah County Circuit Court
030230786; A122061

197 P3d 74

Andrew S. Chilton and Chilton, Ebbett & Rohr, LLC, for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Janet A. Metcalf, Assistant Attorney General, for respondent.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Huckleberry, Senior Judge.

HUCKLEBERRY, S. J.

Edmonds, P. J., concurring.

**HUCKLEBERRY, S. J.**

The Oregon Supreme Court vacated the decision of this court, *State v. Graves*, 212 Or App 196, 157 P3d 295 (2007), *vac'd and rem'd*, 344 Or 401 (2008) (*Graves I*), and in so doing remanded this case for reconsideration as a result of its decision in *State v. Camarena*, 344 Or 28, 176 P3d 380 (2008). Having reviewed *Camarena* as instructed, we once again reverse and remand on Counts 1, 2, and 3, but otherwise affirm.

The issue before us in *Graves I* reduced to whether three statements made to law enforcement—two by the victim's son (D), and a third by the victim herself (Robinson)—were "testimonial" and, as a result, improperly admitted as evidence in violation of defendant's right of confrontation under the Sixth Amendment to the United States Constitution. We decided that two of the three statements were in fact testimonial and, as a result, should only have been admitted through the testimony of the percipient witnesses and not the investigating officer; that is, we held that the admission of that testimonial evidence violated defendant's confrontation rights under the Sixth Amendment.[1]

It was also our conclusion that defendant's convictions needed to be reversed because the error in admitting that testimony was not, as the state contended, harmless. That conclusion was predicated in large part upon the fact that the latter two statements added significant details that strengthened the state's case-in-chief:

"We reach that conclusion primarily because the second and third statements were crucial to the state's case. In fact, the state offered only one witness, the officer who interviewed Robinson and D. The crux of the state's case was Robinson's and D's statements to the testifying officer; those statements were the only evidence describing the incident. In addition, those statements are not cumulative of D's first statement to the officer from the

---

[1] It does not appear that defendant's right to confront witnesses under Article I, section 11, of the Oregon Constitution, was an issue raised for review by this court.

upstairs window. The second and third statements contained more detail about the incident than D's first general statement that defendant 'kicked her in the face when she was sleeping.' "

*Graves I,* 212 Or App at 205. Accordingly, we reversed defendant's convictions for fourth-degree assault and menacing and remanded the matter for a new trial on those charges.

Following our decision in *Graves I,* the Supreme Court decided *Camarena,* a case that, like *Graves I,* involved the admissibility of statements made to law enforcement officers in connection with a domestic disturbance. In *Camarena,* as in *Graves I,* a witness failed to appear in response to a properly served subpoena, and, as a result, was obviously not able to present her own testimony at trial. The state sought successfully to have admitted, as evidence against the defendant, statements made through the 9-1-1 system, as well as statements that witness made to investigating officers. The Supreme Court concluded that statements first made to law enforcement, through the 9-1-1 system, were nontestimonial in nature and therefore admissible. The court also concluded that subsequent statements given to the officers were not obtained for the purpose of responding to an ongoing emergency but, for purposes of comparison, were statements directed at establishing facts only relevant to a subsequent criminal action. 344 Or at 41. For that reason, the court held that the trial court erred in admitting evidence of those subsequent, testimonial statements.

In contrast to our decision in *Graves I,* the Supreme Court concluded that any error in admitting testimonial statements in *Camarena* was harmless because the evidence received was merely cumulative of earlier, nontestimonial statements. When considering this case on remand in light of *Camarena,* the question before us appears to be whether we correctly concluded that the violation of defendant's right of confrontation was, in fact, not harmless, or, alternatively, whether there exists some independent basis for admitting the questioned testimonial evidence.

In *Camarena,* it was the injured complainant who gave the nontestimonial statement to the 9-1-1 operator, which ended up being duly recorded by the 9-1-1 operator.

That statement, along with the complainant's other responses, were later admitted at trial. Ultimately, the Supreme Court determined that the admission of those other responses violated the defendant's right to confrontation:

"[T]he subsequent statements made by the complainant to investigating officers following the 9-1-1 telephone call were also testimonial and should not have been admitted at trial in the absence of an opportunity to cross-examine the complainant."

*Camarena*, 344 Or at 41. Agreeing with this court, however, the Supreme Court pointed out that, although those statements were in fact testimonial,

"their inclusion at trial was harmlessly cumulative, given the admissibility of the complainant's recorded 9-1-1 statements. * * * Although the remainder of the complainant's * * * subsequent statements to police officers were testimonial, we conclude that their admission at trial was harmless. That is so because the 9-1-1 statements that were non-testimonial, and therefore admissible, were of similar content and sufficient to establish the elements of the charge against defendant."

*Id.* at 41-42.

In *Graves I*, by comparison, the initial report was given to a 9-1-1 operator by the victim's son. The 9-1-1 operator thereupon passed the report on to the testifying witness, Officer Debler, who testified at trial as follows:

"Myself and Officer Gibson were dispatched to that location [of] a domestic disturbance. 9-1-1 Dispatch informed us that the reporting party had stated that a female had been assaulted by 'Alonzo,' and that the female had been kicked in the face. Dispatch then informed us that the line had been disconnected shortly after."

When they arrived at the scene, Debler and Gibson were initially unable to make contact with those thought to be residents at the scene of the reported assault. Debler testified:

"As I was knocking on the door, Officer Gibson was peering into the window into the downstairs. He informed me as I was knocking on the door, he saw someone get up and walk away. I started ringing the doorbell and knocking due to my

concern for the safety of everybody inside. I wasn't sure somebody was, you know, physically injured, if they needed medical attention or if there were any children in there that could be injured."

Finally, Debler made contact with one of the residents, D, whom he later learned was a 14-year-old boy. Said Debler:

"Eventually a young boy opened the upstairs window and stuck his head out * * * [and] [h]e told me, 'She won't come to the door.' "

Debler told D that he, the officer, would be forced to "kick the door in if they [the occupants] didn't open the door." Debler testified that, after informing D of the likelihood of forced entry, D then made the first of two statements at issue in this case:

"Alonzo had left on foot. [D] didn't give me any direction or anything like that, but he left it that [Alonzo] had left on foot. He also told me, 'He kicked her in the face when she was sleeping.' "

The prosecutor then asked Debler:

"And did you have an indication of who [D] was referring to?"

Debler responded:

"I had an indication he was talking about whoever Alonzo was."

In *Davis v. Washington*, 547 US 813, 822, 126 S Ct 2266, 165 L Ed 2d 224 (2006), the United States Supreme Court held:

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."

■  In *Graves I*, we concluded that the first statement given by D to Debler (and later admitted as evidence against defendant) was nontestimonial, and that its admission did not violate defendant's right of confrontation under the United States Constitution. We adhere to that view. The officers informed D that they would kick down the door in order for them to be able to respond to what they then perceived to

be an ongoing emergency. D's response—albeit one that found him describing past events—was made primarily for the purpose of informing the officers of the nature or status of the given emergency. In this case, D's remarks were essentially a repeat of what the 9-1-1 operator passed on to the investigating officers, together with a statement that the involvement of the individual said to have caused the harm had ended, as he had left the residence. In short, although the emergency had ended, D's statement to law enforcement officers (where his reply sought primarily to address the remarks or statements directed toward him by one of the officers who made clear that he would have to kick down the residence door should the occupants not open it) remains a statement of the kind that the United States Supreme Court has held is nontestimonial. That is so because D's statement was made under circumstances that could be seen to objectively indicate a primary purpose to determine the proper police response to meet what they perceived to be an "ongoing emergency." *Davis*, 547 US at 822.

In addition, and somewhat akin to the approach taken by the Supreme Court in *Camarena*, 344 Or at 42, the first statement from D to Debler appears to be essentially cumulative of the previous statement given by D to the 9-1-1 operator. In short, the evidence admitted against defendant regarding the first statement from D was limited to, and received on, the following key facts:

1. A female had been assaulted by "Alonzo";

2. The female had been kicked in the face;

3. The female had been sleeping when kicked; and

4. "Alonzo" had left on foot.

D's second statement to law enforcement was made after the police searched the residence where defendant, as it turned out, was not found. The result of the officers' search was consistent with information received from both D and Robinson to the effect that the suspect had left the home. Debler testified:

"[D] told me that early morning on the 15th, he woke up to his mother screaming. He went into the hallway and saw

[defendant], his mother's boyfriend, grabbing her by the shoulders and slamming her up against the wall * * * in the upstairs bedroom * * *. She was screaming and crying and [D] noticed that her eye was bleeding. She was screaming that [defendant] had 'kicked her in the face.' And [D] was scared and called 9-1-1. He also watched as [defendant] started screaming at him and his mother, 'I'm coming back and I'll kill you.' That was when [D] ran downstairs to the kitchen and got the butcher knife. [D] told me that he was very scared of [defendant] and that [defendant] was drunk that night and that he doesn't want [defendant] to hit his mother anymore."

Objectively viewing the circumstances under which the second statement was made by D to law enforcement reveals that the " 'primary purpose of the interrogation [of D was] to establish or prove past events potentially relevant to later criminal prosecution' " as opposed " 'to enabl[ing] police assistance to meet an ongoing emergency.' " *Camarena*, 344 Or at 38 (quoting *Davis*, 547 US at 822).

The second statement given by D to Debler, after it was determined that the emergency had in fact subsided, added the following additional, incriminating evidence to D's first statement:

1.  that he was awakened by his mother's screaming;

2.  that Alonzo was his mother's boyfriend;

3.  that Alonzo grabbed his mother by her shoulders and was slamming her up against the wall;

4.  that his mother was screaming and crying;

5.  that he noticed his mother's eye was bleeding;

6.  that his mother was screaming that Alonzo had kicked her in the face (as opposed to the conclusory statement initially given that she had been kicked in the face);

7.  that Alonzo started screaming at both D and his mother as follows: "I'm coming back and I'll kill you";

8.  that he was very scared of Alonzo;

9. that Alonzo was drunk that night; and

10. that D doesn't want him, Alonzo, to hit his mother anymore (indicating that there had been previous assaults by Alonzo upon his mother).

■ The third statement given to Debler came via the victim, Robinson, D's mother. Like the second statement given by D to Debler, Robinson's statement was given under circumstances that did not indicate the existence of an ongoing emergency. Moreover, the officer's questioning of Robinson was designed to establish or prove past events relevant to a later criminal prosecution—information-gathering objectives by an officer who, at that given juncture, was not dealing with an ongoing emergency.

The third statement Robinson gave to Debler, therefore, added the following factual details to D's previous statements:

1. that she did not need medical assistance;

2. that he, presumably Alonzo, was angry about something she had said to her cousin;

3. that what she said to her cousin was personal, and that she refused to share the same with Debler;

4. that, when asked whether she knew her son was "so scared that he'd armed himself with a knife," she answered, "It don't matter. I answer to God, not you";

5. that, when asked if she wanted to file charges against Alonzo, she replied, "No, I ain't trying to get anyone put in jail. This ain't nothing"; and

6. that Robinson said she "took care of Alonzo," stating, "I gouged his face real good."

The debate in the instant case is not whether the trial court should have, in fact, admitted the first, nontestimonial statement given by D from the window, or the statement obtained by Debler from 9-1-1. As discussed above, those statements were made under circumstances in which,

from an objective point of view, the purpose behind the questions and answers was primarily to enable law enforcement to address how and whether they were going to meet what they fairly perceived to be an ongoing emergency.

The later, testimonial statements of both Robinson and D, however, were erroneously admitted as evidence against defendant in violation of his right to confront and cross-examine those witnesses. As noted above, we held in *Graves I* that it was not harmless error for the trial court to admit Debler's testimony.

■ A key question for this court on remand, then, is whether we correctly reasoned that the testimonial statements of Robinson and D, where both were given after D's admissible nontestimonial statement to law enforcement, were of "similar content and sufficient to establish the elements of the charge against defendant." *Camarena,* 344 Or at 42. In *Camarena,* by way of comparison, the testimonial and nontestimonial evidence admitted was similar in content and effect in proving the elements of the charges leveled against the defendant. In this case, however, the testimonial statements admitted in violation of defendant's right of confrontation were not entirely cumulative and instead added new, significant, and incriminating details to the state's case-in-chief. That is, the testimonial statements given by both D and Robinson, as set out above, are both qualitatively and quantitatively different in a number of ways from the nontestimonial evidence found to have been properly admitted.

In sum, the second statement given by D to Debler, followed by Robinson's statement, were both erroneously admitted and their admission was not harmless. The challenged statements given by these witnesses to law enforcement: (a) were testimonial; (b) added significant incriminating information to the evidentiary mix; and, (c) violated defendant's rights under the Confrontation Clause of the United States Constitution.

Reversed and remanded on Counts 1, 2, and 3; otherwise affirmed.

**EDMONDS, P. J.,** concurring.

This case comes to us on remand by the Oregon Supreme Court for reconsideration after it decided *State v. Camarena,* 344 Or 28, 176 P3d 380 (2008). In our original decision, *State v. Graves,* 212 Or App 196, 157 P3d 295 (2007), *vac'd and rem'd,* 344 Or 401 (2008), we held that D's initial statements to the officers who had arrived at the scene were nontestimonial for purposes of the Confrontation Clause of the Sixth Amendment to the United States Constitution as interpreted in *Crawford v. Washington,* 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), and *Davis v. Washington,* 547 US 813, 126 S Ct 2266, 165 L Ed 2d 224 (2006). We reasoned,

> "the statement was made under circumstances that objectively indicate that the primary purpose of the officer's question was to enable the officer to respond to a *potential* ongoing emergency, because the officers were responding to a domestic disturbance where the 9-1-1 call had been disconnected and the people inside the home would not answer the door. Under those circumstances, it was reasonable for the officer to be concerned for the safety of the occupants of the home, even if the victims indicated that defendant was not inside the home."

212 Or App at 202-03 (emphasis in original).

On remand, the majority again concludes that the first statement given by D to the officers was nontestimonial in nature, presumably adopting our reasoning in our original opinion. Additionally, the majority observes that the statement from D is "essentially cumulative" of the 9-1-1 call in which D indicated that his mother had been kicked in the face before the phone call was disconnected. For the reasons explained below, I respectfully disagree with the majority's conclusion that the initial statement made by D to the officers after they arrived at the scene was nontestimonial in nature.

The facts that give rise to our decision in this case are as follows. Emergency dispatch received a 9-1-1 call from D at about 3:00 a.m. on February 15, 2003. The call was not completed, and two Portland Police Officers, including Officer Debler, were dispatched to the location from which the

call had been made. When they arrived, Debler knocked on the door, but no one answered. The officers could see movement inside the house through the blinds. Debler continued to knock on the door and ring the bell for about 30 to 40 seconds. Eventually, D opened a second-floor window, leaned out and said, "She won't come to the door." Debler informed the boy that he would kick the door down if he did not open it because Debler was concerned that someone inside the residence might need medical attention. Debler then asked D what happened, and D related,

"Alonzo had left on foot. [D] didn't give me any direction or anything like that, but he left it that [Alonzo] had left on foot. He also told me, 'He kicked her in the face when she was sleeping.'"

■ ■ A statement is "testimonial" for purposes of the Confrontation Clause when a statement or affirmation is primarily "made for the purpose of establishing or proving some fact." *Crawford v. Washington*, 541 US at 51.[1] In contrast, a 9-1-1 call, or at least the initial questioning by the 9-1-1 operator of a 9-1-1 caller, is ordinarily not designed to establish or prove some past fact but to discern whether current circumstances require police assistance. In *Davis*, the 9-1-1 caller was speaking to the 9-1-1 operator about events as they were actually happening rather than describing past events. Consequently, the court held those statements to be nontestimonial for purposes of the Confrontation Clause. In *Camarena*, the court held that the complainant's initial recorded responses to the 9-1-1 operator's questions were nontestimonial under the Sixth Amendment because, in part,

---

[1] Under *Davis*, the differences between testimonial and nontestimonial statements are that:

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecutions."

*Davis*, 547 US at 822.

"a reasonable person could infer from the complainant's responses that she faced an ongoing emergency. The complainant was shaken and had sustained an injury to her eye. Defendant's exact whereabouts were unknown when the complainant spoke with the 9-1-1 operator, and there was a reasonable likelihood that defendant might immediately return to their apartment given the extremely short period of time between his exit and the complainant's 9-1-1 call."

344 Or at 41. In other words, the complainant's statements were intended to describe current circumstances requiring police assistance in an effort to terminate an "ongoing emergency" rather than to communicate the occurrence of a past event.

There are obvious differences between the circumstances in this case and the circumstances in *Camarena* and *Davis*. First, this case involves statements made by a witness after the police arrived at the scene of a domestic violence call rather than statements made during a 9-1-1 call. Second, unlike in *Camarena*, there is no evidence in this case that suggests that defendant's return to the scene was imminent. Indeed, D informed the officers that defendant had left the scene. In that light, this case is more like the circumstances in *Hammon v. Indiana*, 547 US 813, 126 S Ct 2266, 165 L Ed 2d 224 (2006),[2] where Amy Hammon spoke with police after they responded to a reported domestic disturbance at the Hammon residence. The court held those statements to be testimonial in nature because her declarations were about what had occurred before the police arrived.

Applying the above rules to the circumstances of this case, I am persuaded that I voted incorrectly for our reasoning in our original opinion. As indicated above, we reasoned that, because the primary purpose of the officer's question to D was to enable the officer to respond to a potential ongoing emergency, defendant's confrontation right under the Sixth Amendment was not implicated. But in *Camarena*, the court held that our focus on the nature of the questions directed at

---

[2] The United States Supreme Court decided *Davis v. Washington* and *Hammon v. Indiana* in a consolidated opinion. 547 US 813, 126 S Ct 2266, 165 L Ed 2d 224 (2006).

the complainant by the emergency operator to the exclusion of the complainant's responses was error. 344 Or at 40. Rather, the appropriate focus under *Davis* is on whether Debler's testimony about D's statements related to events as they actually were occurring in D's presence, or whether D was describing to Debler what had occurred in the past.

In light of that focus, it is evident that D's statements that Alonzo "had left on foot" and that "[h]e kicked her in the face when she was sleeping" are reports of events that had already occurred and are, therefore, testimonial in nature. There may have been an emergency regarding the victim's physical condition that existed at the time, but D's statements do not pertain to that emergency.

That said, the majority's result is correct. Defendant's convictions on Counts 1, 2, and 3 must be reversed because the trial court erred in admitting statements made by D (who did not testify at defendant's trial) in violation of his Sixth Amendment Confrontation right.