Argued and submitted January 29, reversed and remanded August 5, 2009

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## FREDDY A. LAVADORES,
aka Fredy A. Lavadores,
*Defendant-Appellant.*

Multnomah County Circuit Court
060532950; A134791

214 P3d 86

David O. Ferry, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Inge D. Wells, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Rosenblum, Judge, and Deits, Senior Judge.

ROSENBLUM, J.

**ROSENBLUM, J.**

Defendant appeals his convictions for attempted murder, second-degree assault, and third-degree assault. He asserts that the court erred in denying his motion for judgment of acquittal (MJOA) on those charges and in admitting his codefendant's redacted statements without an opportunity for cross-examination, in violation of his confrontation right under the federal constitution.[1] The issues presented here are very similar to those in *State v. Navarrete-Pech*, 230 Or App 157, 213 P3d 1262 (2009), and, because defendant was tried jointly with the defendant in *Navarrete-Pech*, the evidentiary record is identical. In this case, we conclude that the trial court did not err in denying defendant's MJOA, but that it did err in admitting his codefendant's testimonial statements.[2] We further conclude that that error was not harmless. Accordingly, we reverse and remand.

On May 12, 2006, defendant drove to an apartment complex in Portland with three passengers in his vehicle. One of the passengers was defendant's codefendant at trial, Navarrete-Pech (codefendant). The other two passengers were never arrested, and are referred to by their nicknames, "Yucca" and "Chacua."[3] Chacua left the vehicle when it arrived and was not involved in the assaults or attempted murder. Yucca left the vehicle shortly after Chacua did and began speaking with three individuals—the victim, Jaime, and Kiler—who were sitting on the apartment stairs, drinking beer. Yucca talked to them about a past fight, but they responded that they did not know what he was talking about.

---

[1] Defendant also asserts that the court erred in entering a judgment of conviction on the attempted murder charge without a unanimous jury verdict and in imposing Measure 11 sentences on the attempted murder and second-degree assault charges because he was convicted of those crimes on an aiding and abetting theory. Because we reverse and remand for a new trial on the confrontation issue, we do not need to reach those assignments of error, which would afford the same or lesser relief—a new trial and resentencing, respectively.

[2] We address the trial court's denial of defendant's MJOA because the relief for an erroneously denied MJOA—entry of a judgment of acquittal—is more complete than the remedy of remanding for a new trial. *See, e.g., State v. Peterson*, 183 Or App 571, 574, 53 P3d 455 (2002) ("[D]eciding the statutory claim would not obviate the need to examine the constitutional claims, which offer more complete relief.").

[3] Yucca was referred to as "Yucca," "Shorty," and "Shooter" in the briefs and at various stages of this proceeding.

Yucca told either Kiler or the victim that he looked like a man who had hit him in the head with a bottle during the previous fight. Yucca then returned to the vehicle, where defendant and codefendant were waiting. Shortly thereafter, Yucca, defendant, and codefendant returned to the apartments and approached the victim, Jaime, and Kiler. Yucca asked for a beer and, simultaneously, punched the victim in the face.

Jaime responded by punching Yucca and shoving him. After being shoved, Yucca was located about 10 feet away from the victim and Jaime, who were standing close to each other. Yucca pulled out a pistol and pointed it at the victim and Jaime. Jaime threw his beer bottle at Yucca and taunted him. Yucca then stated to the victim, "Mother fucker, I told you I'd whoop your ass." At that point, according to the victim, either defendant or codefendant tried to "get involved" but was prevented from doing so by the victim's friends, who had come out of one of the apartments after the altercation began.[4]

Jaime continued to argue with Yucca, while the victim began moving toward the doorway of the apartment. Codefendant then told Yucca, "[J]ust kill him and let's go" or "[S]hoot him." Yucca fired in the direction of the victim and Jaime, and a bullet struck the victim in the arm. After the shooting, defendant and codefendant ran to defendant's vehicle. Shortly thereafter, Yucca arrived at the vehicle. Defendant drove away with Yucca and codefendant.

Both defendant and codefendant were subsequently arrested, and the pistol used in the shooting was found in defendant's car at the time of his arrest. Defendant and codefendant were interviewed by Detectives Halpin and Hergert of the Portland Police Bureau, respectively. Defendant admitted that the pistol was his. He told Halpin that he had given it to Yucca earlier in the day because Yucca "wanted it" and he thought Yucca "could handle it." Defendant also told Halpin that they had gone to the apartment complex because Chacua wanted to get some cocaine there and that defendant was "standing right there" at the time of the shooting.

---

[4] When the victim was asked for clarification on how defendant or codefendant tried to "get involved," the victim responded that he did not know "whether he was trying to get in there to take the gun away, or to hit Jaime."

Codefendant acknowledged to Hergert that, while Chacua had gone to the apartments to get drugs, Yucca, defendant, and he went there to fight some men with whom Yucca had previously fought. Codefendant also described Yucca's initial departure from the vehicle and Yucca's return to the vehicle where he and defendant were waiting. Codefendant stated that, when Yucca returned, Yucca told them that he had found the person at the apartment complex whom he was looking for (the man whom he had fought with previously and who had broken a bottle over his head) and told them, "[L]et's go fight [the men on the stairs.]" Codefendant said that they agreed and followed him back to the apartments. Codefendant told Hergert that both he and defendant knew that Yucca had brought the pistol to the apartments, because Yucca had shown it to them in defendant's vehicle as they drove to the apartment complex.

Defendant and codefendant were charged with attempted murder, second-degree assault, and third-degree assault on the theory that they aided and abetted Yucca's crimes. Yucca was not arrested or charged. Hergert and Halpin testified at trial, and their testimony included statements made by both defendant and codefendant, neither of whom testified. Defendant and codefendant objected to the introduction of each others' statements as a violation of their federal confrontation right. The court allowed the testimony, but ordered that statements by codefendant that specifically referred to defendant be redacted and, similarly, that any statements by defendant that specifically referred to codefendant be redacted. Both defendant and codefendant repeatedly objected to the redaction, arguing that redaction would not be effective. The court concluded that the redacted statements would not violate defendant's or codefendant's right to confront adverse witnesses and overruled their objections. The pertinent portions of codefendant's statements to Hergert, as redacted, are as follows:

"[Codefendant] said that he was at his house, and that there were three other guys there with him[.] * * * [A]ll four of them left his location, four guys, in a green vehicle[.]

"* * * * *

"[Codefendant] said they were heading over there to the apartments because they had some problems with guys in the apartments, that the four of them left his house earlier that day, and that they were going to go over there and fight these guys, but that, again, Chacua * * * was not going to get involved in the fight[.]

"* * * [Codefendant said that Yucca] shows them a gun that he has on the way over [to the apartment complex.] * * * [T]hey all see this.

"* * * [W]hen asked, 'Why are you guys going over there[?]' his response was, 'to fight.'

"[Codefendant said that] when they get there * * * [Yucca] goes to the apartment complex, and that he comes back and tells them those guys are there, and that, says, you know, 'Let's go get them,' and so they agree to go fight and what they're going to do, he says, is going to fight, throw punches, and throw bottles.

"And, again, it's going to be three of the four, all of them but Chacua, because Chacua knows both sides.

"* * * * *

"[Codefendant said] next [Yucca] fires the gun one time, and that several of them run back to the vehicle—to the vehicle they arrived in, but that, again, Chacua, the one person who was not going to get involved, stays behind. Does not leave with them.

"[When asked why codefendant and the several other people were going there to the fight, codefendant said the victim] was bragging about beating up [Yucca] the other day, that they had an altercation a few weeks prior, that this guy was bragging about it.

"* * * * *

"[When asked whether he agreed to Yucca's request that they go fight the men on the stairs, codefendant said,] 'Several of them do. Yes.' "

The pertinent portions of defendant's statements to Halpin, as redacted, are as follows:

"[When asked who accompanied him to the apartment complex, defendant answered] that he and three others went there because one of the other individuals wanted to

get some more coke, and one of them said that they could get it.

"[When asked what happened next, defendant] said that a person named Chacua had left the vehicle to get some coke, and that the other three of them waited in the car, and they waited there for about a half an hour[.] * * * Yucca[ ] got tired of waiting, and so he left, and he went to look for Chacua, and then Yucca came back to the car, and he was commenting that he had just seen an individual that he had had a problem with in the past.

"* * * [Defendant] at first told us that he waited in the car, and that the others went. * * * [T]hen he admitted that, no, he had gone with them and there was a fight and a shooting, and he said he was standing right there at the time of the shooting.

"[Defendant] said that they'd gone over to this guy that Yucca had had the problem with, and that Yucca had punched this guy, and another guy present, named Jaime, started fighting with Yucca, and hit Yucca with a bottle, and then Yucca pulled a gun out of his pocket and he shot the person that he originally had a problem with.

"* * * * *

"[When asked if defendant admitted that he and several other people went over to the victim, defendant said,] 'Yeah.' He said, 'yeah,' he said, 'We went over to [the victim.]'

"* * * * *

"[When asked what happened after the shooting, defendant answered] '[w]e took off, except Yucca stayed behind[.]' * * * They ran to his car to leave, but one of the guys was saying to wait for Yucca, and so they waited 10 or 15 seconds, and Yucca came, and then they took off, and he said at that point there were three of them in the car because Chacua was still behind."

At the close of the state's evidence, both defendant and codefendant moved for judgments of acquittal on all charges, arguing that the evidence introduced—which, in their view, proved only that they were present at the scene of

crimes committed by Yucca—was insufficient to support their convictions as accomplices. The court denied their motions, and the jury convicted defendant and codefendant of attempted murder, second-degree assault, and third-degree assault.

In defendant's first three assignments of error, he asserts that the trial court erred in denying his MJOA on the attempted murder, second-degree assault, and third-degree assault charges, respectively. He makes one argument that is common to all three assignments, and two distinct arguments that apply only to the third-degree assault. The argument common to all three is that the state failed to prove that defendant had the requisite intent or that he engaged in any conduct that assisted Yucca.

With respect to the third-degree assault only, defendant first argues that, even if he engaged in conduct that assisted Yucca, he could not be convicted of third-degree assault on an aiding and abetting theory. Defendant notes that third-degree assault, as defined by ORS 163.165(1)(e), requires that the assailant be "aided by another person actually present * * *." He argues that the conduct of the aiding person is "necessarily incidental" to the crime and thus does not give rise to liability for aiding and abetting. *See* ORS 161.165(2) (a person is not criminally liable for conduct of another constituting a crime if the "crime is so defined that the conduct of the person is necessarily incidental thereto").

Defendant also argues that, if he in fact aided and abetted Yucca, he is criminally liable only for Yucca's conduct, not the circumstances surrounding that conduct. Specifically, defendant contends that he is not criminally liable for the fact that Yucca was aided by another person actually present. Thus, he contends, he is liable, at most, only for fourth-degree assault.

■ Neither of the latter two arguments are preserved. Defendant argued at trial that ORS 163.165(1)(e) requires two or more active participants in an assault in order for it to constitute third-degree assault. Because Yucca was the sole active assailant in this case, defendant contended, no third-degree assault occurred and, consequently, defendant could

not be liable for aiding and abetting a third-degree assault. Defendant did not argue, as he does on appeal, that any aiding conduct he engaged in was necessarily incidental to the crime. Nor did he argue that he could be held liable only for Yucca's conduct and not the fact that Yucca was aided by another person. Because defendant failed to raise those arguments at trial, they are unpreserved, and we do not consider them.[5] *See State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) ("[A] party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted.").

We turn to defendant's preserved sufficiency of the evidence argument. As we summarized in *State v. Groves*, 221 Or App 371, 378, 190 P3d 390, *rev den*, 345 Or 415 (2008):

> "We review the denial of a motion for judgment of acquittal to determine whether there is evidence in the record from which a rational factfinder, viewing the evidence in the light most favorable to the state and drawing all reasonable inferences in the state's favor, could find the defendant guilty. Although a factfinder may draw reasonable inferences from direct and circumstantial evidence, it may not engage in speculation or guesswork. We review all of the evidence admitted at trial, whether properly admitted or not, so our disposition of defendant's [contention that some evidence was improperly admitted at trial] does not affect our review here."

(Citations omitted.) In the context of accomplice liability, "mere presence" or "acquiescence alone" are not sufficient to establish aiding and abetting, but "the least degree of concert or collusion between accomplices suffices * * *." *State ex rel Juv. Dept. v. Holloway*, 102 Or App 553, 557, 795 P2d 589 (1990).

---

[5] At trial, defendant relied heavily on the Supreme Court's opinion in *State v. Pine*, 336 Or 194, 82 P3d 130 (2003), which he also cites in his brief on appeal. At trial, *Pine* was the subject of significant discussion with the court; defendant asserted that the case stands for the proposition that, for a third-degree assault to occur, two or more assailants must directly participate in causing the injury. Defendant does not renew that contention on appeal.

■  We conclude that there is ample evidence that defendant served as an accomplice and actively assisted Yucca in committing these crimes. Defendant's statements, according to Halpin's testimony, establish that defendant went with Yucca to confront the victims, stayed with him during the confrontation, and waited for him in the vehicle afterwards. The testimony of the victim and Gongora, a resident of the apartment complex, corroborates that defendant accompanied Yucca and establishes that either codefendant or defendant tried to "get involved." Codefendant's statements, as related by Hergert in his testimony, demonstrate that (1) Yucca and defendant went to the apartments to fight someone as retaliation for an earlier altercation; (2) Yucca showed them the pistol while driving to the apartments; (3) Yucca returned to the vehicle and told them that he had found the man he was looking for; (4) Yucca asked them to accompany him "to fight"; (5) they agreed to do so and followed Yucca back to the apartments; and (6) defendant served as the getaway driver for Yucca. Considered as a whole, that evidence is sufficient to support a finding that defendant aided Yucca by providing backup during the altercation and acting as the getaway driver.[6] The evidence also supports the inference that defendant had the requisite intent to aid Yucca. We conclude that the court did not err in denying defendant's motions for judgment of acquittal.

■  In defendant's fourth assignment of error, he argues that the trial court erred in admitting the redacted statements of his codefendant, Navarrete-Pech. According to defendant, the redaction of any explicit reference to him in codefendant's statements was ineffective and, therefore, because codefendant did not testify, the admission of the statements violated his right to confront adverse witnesses. The state responds that the admission of the redacted statements did not violate defendant's confrontation right because

---

[6] We distinguish defendant's role of providing backup for Yucca from "mere presence" or "acquiescence alone," as described in *Holloway*, 102 Or App at 557, because in this case, defendant's presence as backup actually encouraged Yucca: Yucca had found the men that he wanted to fight, but he was outnumbered, and rather than confront them alone, he returned to the vehicle where his friends were waiting. It was only after defendant agreed to accompany Yucca to fight the men that Yucca returned to the apartments and punched and shot the victim.

the "four corners" of the redacted statements are not incriminating—that is, the redacted statements were not themselves incriminating, because they implicated defendant only when considered in light of other evidence introduced at trial. For the reasons that follow, we conclude that their admission violated defendant's confrontation right under the principles expressed in *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), and *Bruton v. United States*, 391 US 123, 88 S Ct 1620, 20 L Ed 2d 476 (1968).

■ Under the Sixth Amendment to the United States Constitution, a criminal defendant has the right to confront witnesses against him or her. In *Bruton*, the United States Supreme Court held that admitting the confession of a nontestifying codefendant in a joint trial violates a defendant's confrontation right if those statements implicate the defendant, because the defendant is denied the opportunity to cross-examine the codefendant. 391 US at 136-37. In *Richardson v. Marsh*, 481 US 200, 211, 107 S Ct 1702, 95 L Ed 2d 176 (1987), the Court established that a defendant's confrontation right is not violated by the admission of a nontestifying codefendant's confession where the statement is "redacted to eliminate not only the defendant's name, but any reference to his or her existence[.]" The Court affirmed the defendant's conviction in *Richardson* after noting that the redacted confession was not incriminating to the defendant until it was "linked with evidence introduced later at trial." *Id.* at 208. In other words, the Sixth Amendment does not prohibit the introduction of a codefendant's confession if the confession is incriminating to the defendant only when viewed in the context of other evidence.

In *Gray v. Maryland*, 523 US 185, 192, 118 S Ct 1151, 140 L Ed 2d 294 (1998), the Court held that the admission of the redacted statements of a nontestifying codefendant that contained an obvious indication of deletion—in that case, replacing the defendant's name with the word "deleted"—violated the defendant's confrontation right. The Court, in distinguishing the case from *Richardson*, stated:

"The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that

a jury ordinarily could make immediately, even were the confession the very first item introduced at trial."

*Gray*, 523 US at 196.

In applying those cases in *State v. Johnson*, 199 Or App 305, 312-13, 111 P3d 784, *rev den*, 339 Or 701 (2005), we concluded that the defendant's confrontation right was violated by the admission of the redacted statements of a nontestifying codefendant. In *Johnson*, the codefendant's confession repeatedly referred to the defendant specifically and described his criminal conduct in detail. In the redacted version that was admitted at trial, the defendant's name was replaced with the terms "the other individual" and "the other person." *Id*. at 313. We noted that the redacted version did not eliminate " 'any reference to [the defendant's] existence' " and "directly and frequently implicated [the] defendant in the crime of felony murder." *Id*. at 312 (quoting *Richardson*, 481 US at 211). We further noted that, as prohibited by *Gray*, the redacted statements contained obvious indications of deletion because "[e]very individual in the confession is named with one conspicuous exception, and the fact of that individual's anonymity is reemphasized with every use of some antecedentless pronoun or generic term." *Johnson*, 199 Or App at 313.

In this case, codefendant's statements were redacted in a way that referred to defendant's existence and described his criminal conduct in detail, *see Richardson*, 481 US at 211, with actual names replaced with generic terms in phrases like "we all" saw the pistol and "three of the four, all of them but Chacua" agreed to go fight. Codefendant stated that "[s]everal" of them agreed with Yucca's plan of fighting the men on the stairs. Considering that codefendant stated that Chacua was not involved in the fight and had gone along only to get drugs, that statement unquestionably implicated defendant.

Moreover, like the ineffective redaction in *Johnson*, every individual in codefendant's statements—with the exception of defendant—was named. Codefendant's statements, as redacted, make it clear that three men were with him when they arrived at the victim's apartment complex: Chacua, who was not involved in the altercation; Yucca, the

one who actually fired the pistol; and another, conspicuously unidentified man who provided backup for Yucca with codefendant. As defendant argues, it was obvious from the redacted statement that defendant was that conspicuously unidentified individual who, along with codefendant, aided Yucca in the assaults and attempted murder. The redactions in this case have the fundamental flaw identified in *Johnson* —the use of terms like "others" and "they" combined with the use of proper names or nicknames for every other individual alerts the jury to the fact that someone's—defendant's— name has been deleted. *See Johnson*, 199 Or App at 313. As the Court stated in *Gray*, "redaction that replaces a defendant's name with an obvious indication of deletion * * * falls within *Bruton*'s protective rule." 523 US at 192. We conclude that the trial court erred in admitting codefendant's redacted statements.

■ ■  Having concluded that defendant's confrontation right was violated, we further conclude that the error was not "harmless beyond a reasonable doubt." *See Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986) (stating the federal standard for harmless error). In determining whether an error was harmless, we consider the importance of the improperly admitted evidence in the state's case, whether the evidence was cumulative, whether the evidence was corroborated by properly admitted evidence, and the overall strength of the state's case. *See State v. Cook*, 340 Or 530, 550, 135 P3d 260 (2006) (concluding that constitutional error was harmless beyond a reasonable doubt based on those factors).

The defense theory was that defendant was merely present while Yucca committed the assaults and attempted murder. Halpin's properly admitted testimony established that defendant gave Yucca a pistol, drove him to the apartments, was present during the assault and shooting, waited for him afterward, and drove him home. Properly admitted testimony of the victim and Gongora confirmed that defendant was present at the assault and shooting and that he may have tried to "get involved" in some unspecific way.

In contrast, codefendant's improperly admitted statements established that everyone in the vehicle besides

Chacua went to the apartments with the purpose of fighting, that Yucca showed everyone in the vehicle the pistol, that Yucca asked defendant to accompany him back to the apartments to fight the man he had found there, and that defendant did so. The codefendant's statements were important to the state's case because they tended to show that defendant's actions aided Yucca and that defendant acted with the intention of aiding him. That is, the statements were central to the state's theory that defendant was an accomplice to Yucca, and not just a bystander. Moreover, the improperly admitted evidence was neither cumulative of, nor corroborated by, other evidence. Codefendant's statements provided unique evidence at trial and conflicted, at least in part, with defendant's own account of what he knew in advance and what his intent was in transporting and accompanying Yucca.

In short, the state's case, without codefendant's improperly admitted statements, was not strong. Defendant's presence at the scene of the altercation and his provision of a pistol and transportation to Yucca are evidence of aiding and abetting only if the state can demonstrate that defendant acted with the intention of aiding in Yucca's commission of the underlying crimes. Codefendant's statements supported the state's theory that defendant intended to aid Yucca when defendant provided him with a pistol, transportation, and backup during the altercation. Because "mere presence" and "acquiescence alone" are not sufficient to establish aiding and abetting, *see Holloway*, 102 Or App at 557, codefendant's testimony was critical to the state's case.

Although the jury could have concluded from the properly admitted evidence that defendant aided Yucca, it is reasonably possible that it also relied on—or relied instead on—codefendant's erroneously admitted statements in reaching that conclusion. *See State v. Graves*, 224 Or App 157, 166, 197 P3d 74 (2008) (concluding that error was not harmless where "testimonial statements admitted in violation of [the] defendant's right of confrontation were not entirely cumulative and instead added new, significant, and incriminating details to the state's case-in-chief"). Thus, we cannot say that the trial court's error in admitting codefendant's statements in violation of defendant's confrontation right was "harmless beyond a reasonable doubt." *Cf. Van*

*Arsdall*, 475 US at 681 (affirming conviction despite constitutional error because error was harmless). Accordingly, we reverse and remand defendant's convictions for attempted murder, second-degree assault, and third-degree assault.

Reversed and remanded.