Argued and submitted July 6, portion of judgment requiring defendant to pay $1,480 in restitution reversed, otherwise affirmed September 7, petition for review denied December 7, 2023 (371 Or 715)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RONALD CLIFFORD MILLER,
*Defendant-Appellant.*

Linn County Circuit Court
19CR35259; A176919

537 P3d 191

Defendant was convicted of first-degree unlawful sexual penetration, ORS 163.411, and first-degree sexual abuse, ORS 163.427. In his first assignment of error, defendant argues that the trial court erred in allowing a witness to engage in impermissible vouching to which defendant objected. In his second and third assignments of error, defendant argues that the prosecutor made improper statements in closing argument and that the trial court plainly erred in failing to either strike those statements or declare a mistrial. In his fourth assignment of error, defendant argues that the trial court plainly erred in imposing $1,480 in restitution, because there was no evidence of reasonableness. *Held*: Any error in overruling defendant's vouching objection was harmless on this record. As for the prosecutor's closing argument, some statements were improper, but they were not so prejudicial as to deny defendant a fair trial, so the standard for plain error in this context was not met. The trial court did err in ordering restitution on this record, however, as the state conceded.

Portion of judgment requiring defendant to pay $1,480 in restitution reversed; otherwise affirmed.

David E. Delsman, Judge. (Judgments entered August 19, 2021)

Thomas McHill, Judge. (Amended Judgment entered July 11, 2022)

Emily P. Seltzer, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Jacquot, Judge.

AOYAGI, P. J.

Portion of judgment requiring defendant to pay $1,480 in restitution reversed; otherwise affirmed.

**AOYAGI, P. J.**

Defendant was charged with sex crimes against two children, C and K. The charges were tried to the court, which found him guilty on both counts. Defendant appeals the resulting judgment of conviction. In his first assignment of error, defendant argues that the court erred in allowing C's adoptive mother to opine about C's credibility over defendant's objection. In his second and third assignments of error, defendant argues that the court plainly erred in failing to strike improper statements by the prosecutor during closing argument or, alternatively, declare a mistrial. In his fourth assignment of error, defendant argues that the court plainly erred in imposing $1,480 in restitution. For the following reasons, we reverse the restitution order and otherwise affirm.

## FACTS

In 2012, C was eight years old, and her half-sister K was five years old. C was living with her biological father and his wife, Laurie, who later adopted C. C had scheduled visitation at the home of her biological mother, Jessica, every other weekend and for two hours on Wednesdays. K was living with Jessica at that time. Jessica also had roommates in the house. A woman named Rivera lived there. For three to four months in early 2012, defendant also lived there, until Jessica kicked him out for not paying rent.

While defendant was living in Jessica's house, he would babysit the girls and be left alone with them. According to C and K, defendant sexually abused them.

In 2012, Detective Fairall spoke to Jessica and interviewed C as part of investigating Jessica in connection with another matter. Jessica denied that either C or K had reported abuse to her directly, but she relayed that K's grandmother had said that K had said that defendant touched K. In C's interview, C described defendant as "weird" but denied that anyone had touched her inappropriately. Fairall used a drawing to ask C if anyone had touched her on different body parts. C tensed up and forcefully said "not doing it" when asked about the breast area; said "nope"

as soon as Fairall pointed to the pubic area and, when asked if she did not want to talk about that area, shook her head and said "no questions either"; and said "don't want to do it" when Fairall pointed to the buttocks area. When asked if any of her mother's boyfriends had done anything that she did not think was right, C responded only that defendant spanked K. That was about all that Fairall could "get out of her." Fairall "sensed that something had happened to her" but did not press her further because "she wasn't ready to talk" and he thought that it would be harmful to try to force her to talk before she was ready. Fairall wrote in his report closing the investigation, "[I]nvestigation will be reopened at such time that [K or C] disclose sexual abuse by Ronald Miller."

Nothing further happened until 2019, when Laurie discovered that C, then 14 years old, had participated in "vulgar" text messages and sent a sexually explicit photo of herself to a boy. C started counseling and, in January 2019, after her second counseling session, told Laurie that defendant had sexually touched her and K. Laurie, who is a mandatory child abuse reporter, made a police report. In interviews during the subsequent police investigation, both C and K described sexual abuse by defendant. For his part, defendant told the police that he had only lived with Jessica for a couple days and did not remember C or K, and he denied any sexual touching.

Defendant was charged with first-degree unlawful sexual penetration, ORS 163.411, as to C (Count 1), and first-degree sexual abuse, ORS 163.427, as to K (Count 2). He waived his right to a jury trial, so the charges were tried to the court. At trial, in addition to the previously described facts, there was disputed evidence that C and K each reported abuse to Jessica in 2012 and that C reported K's abuse to K's grandmother in 2012, as well as evidence that Rivera thought that defendant was "too touchy and clingy" with K, saw red flags and had a bad "gut" feeling, and told Jessica in 2012 that she was uncomfortable with C and K being left alone with defendant. After hearing the evidence, the court found defendant guilty on both charges and entered a judgment of conviction.

## LAURIE'S ALLEGED VOUCHING

In his first assignment of error, defendant argues that the trial court erred in allowing C's adoptive mother, Laurie, to opine about C's credibility.

On direct examination, Laurie testified regarding C's abuse disclosure in January 2019, which took place in the parking lot after C's counseling session. Laurie described that C "just broke down" in the car and was "just sobbing and sobbing" for several minutes, while Laurie hugged her. "Her demeanor—it wasn't [C]," and Laurie could tell "this was something big." C finally said, "Ron Miller touched me." C provided only a couple details when Laurie asked and otherwise did not want to talk about it. It was a "very short" conversation, "but the sobbing continued" for "a good 15, 20 minutes" in the parking lot.

On cross-examination, defense counsel asked Laurie whether she had told a police officer that she "had issues with [C] lying and sneaking around to communicate with boys," had expressed frustration with C's dishonesty, and had said that she was not sure whether C would be honest with the officer. In response, Laurie testified that C "wasn't forthcoming with the truth," that C sometimes had to be reassured that something was normal teenage behavior or the like before she would be honest with Laurie, that Laurie considered it "pretty normal with teens to try to deny and not be truthful to see if they can get away with it," and that Laurie did express frustration and tell the officer that she was not sure whether C would be honest with the officer. Laurie concluded her answers to that line of cross-examination by stating, "I guess I can kind of tell when she—her—the fibbing that she would do, like if you would ask 'Are you talking to boys on the computer while I'm at work?' 'No.' When she—I can tell when she's lying. Let's just say that. She's not a good liar." Defense counsel then moved on to another topic.

On redirect examination, Laurie explained what she had meant by her testimony that C is "not a good liar," to which defense counsel did not object, then answered a follow-up question about C's demeanor during the disclosure incident in January 2019, to which defendant did object:

"[PROSECUTOR]:   You said that she's not a good liar. What did you mean?

"[LAURIE]:   I can just tell. Now you're going to make me disclose all my ways that I know.

"[PROSECUTOR]:   Well, if that would ruin your parenting strategies I don't know if I need to—

"[LAURIE]:   Well, she'll be an adult here in March so… She's very somber and very monotone when she is lying, and when she is telling the truth—and there's been times that I've questioned her about something that I'd expect her to lie. It's the tears and 'Can I just tell you why I did this?' or 'why I made that decision,' or sometimes her voice. If she's not monotone when she's lying her voice will go up like 'I didn't—'

"[PROSECUTOR]:   I'm not going to make you reveal all your tricks. *Is what you're describing here anything remotely like what you observed on January 29 when she disclosed to you?*

"[LAURIE]:   *No. No.*

"[DEFENSE COUNSEL]: Well, that—that sounds like vouching. I would object."

(Emphases added.)[1]

The prosecutor responded to the objection by arguing that Laurie was not offering her own opinion on whether C was telling the truth or vouching for C's truthfulness but, rather, that "[s]he's saying 'The behaviors that I observe when she's lying were not apparent,' like the physical demeanor question. I think I've been careful to toe that line." Defendant reiterated, "It still sounds like vouching to me." The court overruled the objection. The prosecutor then changed topics.

No mention was made of the challenged testimony in closing argument. The main theme of the prosecutor's closing argument was that the state's case came down to

---

[1] To the extent that defendant's opening brief was not entirely clear as to the scope of his claim of error, defendant acknowledged in his reply brief and at oral argument that trial counsel objected only to the above-italicized question and answer, and defendant confirmed that he is challenging only the ruling on that objection.

whether the trial court believed C's and K's trial testimony: "Ultimately if you strip away the frills of the state's case the core, in essence, of all of this it comes down to the force and potency of the testimony of these two young ladies." The prosecutor made specific arguments as to why the court should view the girls' trial testimony as credible, including that it was internally consistent and consistent between them, that there were "visceral details" about the abuse that rang true, and that the girls were clear and emotionally intelligent in their testimony. The prosecutor then pointed to particular evidence from other witnesses that corroborated the girls' testimony—which did not include the challenged testimony—while reiterating that the court could find defendant guilty based on the girls' testimony alone.

Defense counsel's closing argument challenged the persuasiveness of the state's evidence. The defense did not contend, however, that C was lying about her present belief that she was sexually abused in 2012—although the defense did suggest that C was lying about having reported it to family members in 2012. Early in closing, defense counsel said regarding C and K, "They both seem very sincere, and I believe that they believe what they're saying." He later stated that he did not think that C was "being untruthful" about believing that she was sexually abused, explaining that "in her own mind I think that perhaps something happened and I think her mind developed some kind of a constructed something." He posited that "[m]aybe [C] did see touching with [K] and she felt guilty about that and that's why her mind constructed something." Defense counsel also emphasized that it had been nine years since the alleged events.

At the conclusion of the trial, the court announced that it was finding defendant guilty on both charges, stating:

"I have had an opportunity to review my notes. Earlier today when we had our break, I had an opportunity to review some witness testimony, as well as the exhibits that have been offered and received during the course of this trial.

"I won't offer much by way of comment regarding the evidence other than to say I did find the testimony of both

[C] and [K] to be credible, and as occurs in all criminal cases there are variances in particular witness testimony, but I found overall that the statements of the witnesses was coherent and cohesive and I am convinced beyond a reasonable doubt with regard to Count 1, Unlawful Sexual Penetration in the First Degree, the defendant is guilty, with regard to Count 2, Sexual Abuse in the First Degree, guilty as well."

On appeal, defendant argues that the trial court erred in overruling his vouching objection during redirect examination of Laurie and that he should be given a new trial because the error was not harmless. The state responds that the court did not err in overruling the objection, because Laurie's testimony fell on the side of permissible demeanor evidence and could properly be considered for nonvouching purposes. Alternatively, the state argues that any error in overruling the objection was harmless.

"Vouching" refers to the expression of one's personal opinion about the credibility of a witness. *State v. Chandler*, 360 Or 323, 330-31, 380 P3d 932 (2016) (discussing the history of the "judicially created rule" against vouching). Credibility determinations are the exclusive province of the jury, so witnesses are categorically prohibited from expressing a view on whether another witness is "telling the truth." *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983); *accord State v. Black*, 364 Or 579, 587, 437 P3d 1121 (2019) ("[T]estimony that constitutes vouching is categorically inadmissible."). "[T]he rule against vouching prohibits a witness from making a direct comment, or one that is tantamount to a direct comment, on another witness's credibility." *Id.* at 585. "Whether a witness's statement constitutes impermissible vouching is a legal question." *State v. Sperou*, 365 Or 121, 128, 442 P3d 581 (2019).

It is a somewhat complicated question whether the trial court erred in overruling defendant's objection to Laurie's testimony that, during the January 2019 disclosure incident, Laurie did not observe C engaging in any of the previously described behaviors that Laurie associated with C lying—primarily because defendant either elicited or did not object to Laurie's prior testimony, and it is only in

the context of that prior testimony that Laurie's challenged answer can be viewed as vouching.

Generally, "testimony about the physical appearance of a speaker, or testimony that is solely descriptive of the manner in which a communication is made—so-called demeanor evidence—is admissible and is not vouching evidence." *State v. Wilson*, 266 Or App 481, 490, 337 P3d 990 (2014), *rev den*, 356 Or 837 (2015); *see also State v. Lupoli*, 348 Or 346, 362, 234 P3d 117 (2010) ("[O]bservations of [the complainant's] physical characteristics and demeanor ordinarily would not be, in and of themselves, impermissible vouching."). However, in some cases, otherwise admissible demeanor testimony may be "inextricably bound up with" impermissible vouching testimony, such that all of it should be excluded. *Lupoli*, 348 Or at 362 (holding that all of a witness's challenged testimony should have been excluded, including both "clear" vouching testimony and demeanor testimony that was "inextricably bound up with" the prior vouching testimony).

Here, Laurie's simple "no" answer to the challenged demeanor question was inextricably bound up with her prior testimony that C is not a good liar and that Laurie associates certain behaviors with C lying. It effectively communicated to the factfinder that Laurie did not perceive C to be lying during the 2019 disclosure incident.

If defendant had successfully objected to Laurie's earlier testimony, then it would have been impossible for the prosecutor to even ask the question at issue. Or, if defendant had objected to Laurie's earlier testimony, it had been allowed, and we were to conclude on appeal that the earlier testimony should have been excluded,[2] there is little doubt that we would conclude that the later testimony should have been excluded as well. *See Lupoli*, 348 Or at 356, 362 (holding that "otherwise permissible or potentially permissible" demeanor testimony should have been excluded, where it was "inextricably bound up with" prior testimony "that constituted clear 'vouching,'" where the defendant had "objected to all" of it with specific and continuing vouching objections).

_____

[2] We express no opinion on the admissibility of Laurie's earlier testimony, which was not objected to at trial and is not challenged on appeal.

What is less clear is whether Laurie's objected-to demeanor answer should be treated as vouching testimony in context, even though the testimony that provides that context all came in without objection. Defendant has not cited any case in a comparable posture.

Ultimately, however, we need not conclusively decide whether the trial court should have sustained defendant's vouching objection, because we agree with the state that any error in overruling it was harmless on this record.

We may not reverse a criminal conviction based on the erroneous admission of evidence if the error did not substantially affect the defendant's rights, *i.e.*, if it was harmless. *State v. Davis*, 336 Or 19, 27-28, 77 P3d 1111 (2003) (discussing the Oregon Constitution, Article VII (Amended), section 3); OEC 103(1) ("Evidential error is not presumed to be prejudicial."). The standard reduces to "a single inquiry: Is there little likelihood that the particular error affected the verdict?" *Davis*, 336 Or at 32; *see also Purdy v. Deere and Company*, 355 Or 204, 226, 324 P3d 455 (2014) ("This court's previous decisions that have applied the standard to instances of instructional and evidentiary error generally indicate that little likelihood is not enough, but more—that is, 'some' or a 'significant' likelihood that the error influenced the result—will suffice for reversal."). In making that determination, "we examine the record as a whole and consider the error and the context in which it occurred." *State v. Durando*, 262 Or App 299, 305, 323 P3d 985, *adh'd to as modified on recons*, 264 Or App 289, 331 P3d 1095, *rev den*, 356 Or 400 (2014).

Here, Laurie testified without objection that C is "not a good liar" and that, as C's mother, she believes that she can tell when C is lying, as well as describing the behaviors that she associates with C lying. Laurie also testified in detail, as previously described, to C's demeanor during the January 2019 disclosure incident, and what Laurie described bore no similarity to the behaviors that Laurie later testified to associating with C lying. Laurie also made a police report based on what C told her. Based on the evidence that was admitted without objection, it already would have been apparent to the factfinder that Laurie personally

believed C's assertion that defendant sexually touched her in 2012, or at least did not think that C was lying.

Further, the prosecutor did nothing in closing argument to draw attention to that apparent fact generally, or to the challenged testimony specifically. His arguments focused primarily on C's and K's trial testimony and secondarily on specific corroborating evidence. Meanwhile, defense counsel did not contend that C was lying about her belief that she was sexually abused. *See State v. Maiden*, 222 Or App 9, 13, 191 P3d 803 (2008) ("[I]n determining the possible influence of the error on the verdict, we consider the importance of the erroneously admitted evidence to a party's theory of the case."). Defense counsel argued that C's memory of what happened nine years earlier was unreliable, and he suggested that C had lied about disclosing to family members in 2012, but the defense made a clear strategic choice not to argue that C was lying about her present belief that she had been sexually abused. Thus, although the reliability of C's memory and the credibility of her claims of past disclosure were central issues, whether C presently believed that she had been sexually abused was not a central issue.

Finally, it is apparent from the trial court's speaking verdict that the court relied primarily on its own assessment of C's and K's credibility on the witness stand in finding defendant guilty.

Considering all of the foregoing together, we conclude that, even assuming that the court erred in overruling defendant's objection—because, in the context of prior testimony admitted without objection, Laurie's answer to the prosecutor's final demeanor question amounted to vouching—there is little likelihood that the error affected the court's verdict. Because any error was harmless, we reject the first assignment of error.

## PROSECUTORIAL STATEMENTS IN
## CLOSING ARGUMENT

Defendant next contends, in his second and third assignments of error, that the prosecutor made improper statements in closing argument and that the trial court erred by failing to either strike them or declare a mistrial.

Defendant did not object at trial, so he requests plain-error review.

"Generally, an issue not preserved in the trial court will not be considered on appeal." *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000). However, we have discretion to correct a "plain" error. ORAP 5.45(1). An error is "plain" when it is an error of law, the legal point is obvious and not reasonably in dispute, and the error is apparent on the record without our having to choose among competing inferences. *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013). It is a matter of discretion whether we will correct a plain error. *State v. Gornick*, 340 Or 160, 166, 130 P3d 780 (2006).

The Supreme Court recently addressed in *State v. Chitwood*, 370 Or 305, 307, 518 P3d 903 (2022), how to approach plain-error review in the specific context of a challenge to prosecutorial statements in closing argument to which the defendant did not object. In short, it must be "beyond dispute that the prosecutor's comments were so prejudicial as to have denied defendant a fair trial." *Id.* at 312 (internal quotation marks omitted). Moreover, "a defendant asserting plain error must demonstrate that the prosecutor's comments were so prejudicial that an instruction to disregard them would not have been sufficiently curative to assure the court, in its consideration of all the circumstances, that the defendant received a fair trial." *Id.* That is, "prosecutorial statements that were improper but *curable* are not an appropriate subject of plain-error review, because, in such circumstances, the defendant was not denied a fair trial." *State v. Durant*, 327 Or App 363, 366, 535 P3d 808 (2023) (emphasis in original). That is important because, "[g]enerally, a proper jury instruction is adequate to cure any presumed prejudice from a prosecutor's misconduct." *State v. Davis*, 345 Or 551, 583, 201 P3d 185 (2008), *cert den*, 558 US 873 (2009).

Here, defendant challenges various statements that the prosecutor made during closing argument to the court, arguing that the prosecutor impermissibly vouched for the complainants at several points and thrice referred to facts not in evidence. Having reviewed the record, we disagree that the prosecutor impermissibly vouched for the complainants.

The challenged statements were permissible arguments regarding the persuasiveness of the evidence and did not cross the line into vouching. We therefore reject that portion of defendant's argument without further discussion.

As for the prosecutor's three alleged references to "facts not in evidence," we begin with the one that defendant views as most egregious, keeping in mind that it must be beyond dispute that the prosecutor's comments were so prejudicial as to have denied defendant a fair trial. During closing argument, the prosecutor remarked that defense counsel seemed to view Fairall's testimony as calling C's honesty into question. He argued that the better view of Fairall's testimony was that "Fairall believed [C] in 2012 without her having to say a word," *i.e.*, that Fairall believed that something had happened to C without C having to say so. The prosecutor told the court that the phrase he used ("Fairall believed her in 2012 without her having to say a word") was what "my victim services advocate" had written down as her "impression" of Fairall's testimony, that it was also the prosecutor's "impression" of Fairall's testimony and "what his testimony truly signified," and that the prosecutor hoped the court had the same impression of Fairall's testimony.

Defendant argues that the foregoing remarks relayed the prosecutor's and the victim services advocate's shared view that Fairall's testimony "was credible, meaning that, in turn, C's allegations were credible"—and thus constituted impermissible vouching. We disagree. It was improper for the prosecutor to reference the victim services advocate as having supplied the particular phrasing that he was using in argument. However, substantively, what the prosecutor said was not vouching, because he was arguing about how the content of Fairall's testimony should be understood, not expressing his (or the victim services advocate's) personal opinion of the credibility of Fairall's testimony. Moreover, what Fairall "believed" after interviewing C was something that C did not say and in fact denied, so Fairall cannot be viewed as vouching for the credibility of what C told him, to the extent there is any suggestion to that effect in defendant's argument.

Defendant next challenges a statement that the prosecutor made at another point in closing argument: "[T]his isn't a jury where we really needed to explain reasons why kids don't disclose. I know you've been at this a long time and that you understand the principles of why kids don't disclose and how their sophistication increases over time and hence the disclosure later, the fear, the threats, indicia of reliability." We agree with defendant that any suggestion that the state's evidentiary burden might be different in a bench trial than a jury trial is improper. At the same time, the basic concept that delayed disclosure is not uncommon among child sex abuse victims is arguably approaching the point of common knowledge, or at least could be understood as something that could be referenced in broad terms in a case like this one, where C testified that defendant had threatened to hurt K and C's parents if C told anyone about the abuse. The statement was improper but not necessarily egregious.

Lastly, at another point in closing argument, the prosecutor argued, in discussing Rivera's testimony, that people sometimes know something without being able to articulate how they know it, said that the popular author Malcolm Gladwell refers to that ability as "thin slicing," and gave two examples from Gladwell's book. It is not uncommon for attorneys to try to work in popular references in making a point. It is debatable whether this was an appropriate use of that argument technique. We assume for present purposes that it was improper.

We are unpersuaded that the prosecutor's three improper statements were so prejudicial that the trial court could not have stricken them and, instead, was legally required to declare a mistrial. This was a bench trial. We have no doubt that the trial judge would have been able to disregard those statements if defendant had objected and the court had stricken them. It will be the rare case in which an improper statement made by an attorney in closing argument to the court is so prejudicial that the court is legally required to declare a mistrial. Because the challenged statements here could have been stricken, without the court having to declare a mistrial, defendant has not established

plain error under *Chitwood*. *See Chitwood*, 370 Or at 312; *Durant*, 327 Or App at 372. We therefore reject defendant's second and third assignments of error.

## RESTITUTION

In his fourth assignment of error, defendant asserts that the trial court plainly erred in ordering him to pay $1,480 in restitution to the Criminal Injuries Compensation Account for costs paid for counseling for C, because there was no evidence that those costs were reasonable. *See State v. McClelland*, 278 Or App 138, 143, 147, 372 P3d 614 (2016), *rev den*, 360 Or 423 (2016) (discussing evidentiary requirement to prove that a charge for medical services was "reasonable," and reversing restitution order where the state failed to meet its burden of proof).

We review the imposition of restitution for errors of law. *State v. Thorpe*, 217 Or App 301, 303, 175 P3d 993 (2007). In this case, there was no evidence at all regarding the challenged costs, and the state concedes that the trial court plainly erred and that we should exercise our discretion to correct the error. Having reviewed the record, we agree on both points. *Cf. State v. Riverman*, 320 Or App 388, 389, 513 P3d 13 (2022) ("[W]e agree with the parties that the trial court plainly erred in imposing restitution for the hospital and chiropractic expenses when the state did not establish that those expenses were reasonable, and we exercise our discretion to correct the error. "). Accordingly, we reverse the order that defendant pay $1,480 in restitution.[3]

Portion of judgment requiring defendant to pay $1,480 in restitution reversed; otherwise affirmed.

---

[3] *See State v. Park*, 317 Or App 692, 696, 505 P3d 1026 (2022) (noting that, upon reversal of a restitution order, remanding is appropriate "if the record indicates that the trial court may have an alternative basis on which to impose restitution," and reversing without remanding for resentencing where that was not the case).