238 October 15, 2025 No. 901

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ALEXANDER JESUS MOSQUEDA-RIVERA-BURDETTE,
*Defendant-Appellant.*

Marion County Circuit Court
20CR36651; A182273

J. Channing Bennett, Judge.

Submitted May 15, 2025.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Stacy M. Du Clos, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Solicitor General, and Paul L. Smith, Deputy Solicitor General, filed the brief for respondent.

Before Tookey, Presiding Judge, Kamins, Judge, and Jacquot, Judge.

JACQUOT, J.

Conviction on Count 1 reversed and remanded; remanded for resentencing; otherwise affirmed.

Tookey, P. J., dissenting.

**JACQUOT, J.**

Defendant was convicted of second-degree murder (Count 1), tampering with physical evidence (Count 2), first-degree abuse of a corpse (Count 3), and second-degree abuse of a corpse (Count 4) following a bench trial. The primary issue in dispute at trial was whether defendant acted in self-defense. Defendant raises five assignments of error. We focus on defendant's fifth assignment of error, in which he requests plain-error review and contends that he was deprived of a fair trial due to impermissible comments made by the prosecutor about self-defense law during closing argument to the trial judge. We conclude that that assignment of error is well taken and that it is appropriate to exercise our discretion to correct it; we reverse and remand.

We reject defendant's first through third assignments of error, in which he contends that the trial court erred by denying defendant's motions for judgment of acquittal on Count 1.[1] Further, given our disposition with regard to defendant's fifth assignment of error, we need not address his fourth assignment of error, in which he contends that the trial court erred when it relied on a fact not in evidence to reach its verdict on Count 1.

---

[1] As noted, in defendant's first, second, and third assignments of error, he argues that the trial court erred by denying defendant's motions for judgment of acquittal (MJOA) on Count 1. "We address the trial court's denial of defendant's MJOA[s] because the relief for an erroneously denied MJOA—entry of a judgment of acquittal—is more complete than the remedy of remanding for a new trial." *State v. Lavadores*, 230 Or App 163, 165 n 2, 214 P3d 86 (2009).

Defendant moved for judgment of acquittal three times: at the conclusion of the state's case-in-chief, at the conclusion of the defense's case, and at the conclusion of the state's rebuttal case.

"We review a trial court's denial of a motion for judgment of acquittal for legal error, and we consider the facts in the light most favorable to the state and draw all reasonable inferences in the state's favor, to determine whether the evidence is sufficient to permit a rational factfinder to find all the elements of the charged crime beyond a reasonable doubt."

*State v. Lugo*, 322 Or App 477, 479, 520 P3d 917 (2022) (internal quotation marks and citation omitted).

We are unpersuaded by defendant's argument that a reasonable factfinder could not have found that the state met its burden to overcome any reasonable doubt as to whether defendant acted in self-defense. This record contains some evidence that support's the state's theory of the case and some evidence that support's defendant's theory of the case. For that reason, defendant was not entitled to acquittal as a matter of law, and the court did not err by denying his MJOAs.

Defendant was 18 at the time that his conduct caused the death of J. Prior to that, J had lived with defendant and his family for several months. J was asked to move out due to behavior that the family, including defendant, felt was violent, threatening, and involved bringing drugs and random people into their home. He was told not to come to the apartment unless defendant's mother or stepfather was home. Several weeks later, at a time when neither parent was home, J entered the apartment—without knocking—and sat on the couch. Defendant told J to leave, but J did not. Defendant and J began a physical altercation. Defendant testified that they were struggling for control of a knife and that he feared for his life. Defendant's hand was cut during the incident. Defendant also struck J twice on the head with a gun and subsequently dropped the gun to the ground. Defendant gained control of the knife and began swinging it at J. He testified that he did not know how many times he swung the knife, but he estimated seven to nine times. Defendant testified that J continued to attempt to regain control of the knife and that the wounds inflicted to J's back were caused during that struggle.

After J died, defendant involved multiple family members in an elaborate effort to dispose of J's body and clean blood from the apartment. He placed J's body into a bathtub and ran water for several hours to drain the blood and attempted to conceal the body in more than one location, including a closet and underground in the backyard of his apartment complex. When defendant became concerned that law enforcement would locate J's body, he dug it up and attempted to dismember it. He then hid J's partially dismembered body under the crawlspace of a nearby home. Defendant agreed that some of his behavior after J's death—including trying to dismember J's body to make it easier to transport and dispose of—"was disgusting."

Defendant explained that immediately after the altercation with J, he "didn't know what to do," and "didn't want to call the cops [because] I didn't feel like the cops would trust me or believe me." Defendant's perception that he would not be believed by law enforcement was informed by past experiences in which he and others around him were

not believed by officers. He testified that he avoids interactions with officers because he "do[esn't] have any trust" in them. Defendant was also worried that if he was taken into custody and appeared on the news, that people would threaten his family. Defendant testified that he felt like taking steps to conceal J's body "was my only choice," given his perception about law enforcement and his fear for his family members' safety.

Defendant does not dispute that his conduct caused J's death. Defendant does not dispute that he went to great lengths to dispose of J's body and clean blood from the apartment. Defendant does not dispute that he initially tried to evade questions from law enforcement and lie about what happened. The only issue in dispute at trial was whether defendant's actions constituted lawful self-defense. Defendant said that he "was fearing for my life," that he had no intent to kill J, and that when he was swinging the knife at J, his intent was "[t]o just stop him from attacking me, [because] I thought if [J] was going to be able to have full control of the knife that he would stab me and kill me."

The state's evidence at trial included testimony from a medical examiner—that J's skull was fractured during the incident; that he sustained a total of 22 wounds in addition to the skull fractures, including several stab wounds to his lower back or buttocks; and that J's cause of death was a stab wound to his carotid artery, which caused him to lose too much blood to survive. Defendant's brother—who did not see the altercation begin—testified that after the incident began, he entered the living room and saw J sitting on the floor, bleeding and crying. The brother testified that he briefly went to a different room of the home, before returning to observe defendant and J in the kitchen. He testified that he saw defendant making a stabbing motion toward J while J was facing a sliding door and trying to leave.[2]

Because self-defense law was central to the case, we briefly state the applicable law. A defendant accused of

_____

   [2] The brother testified that he saw defendant make a stabbing motion toward J, but that he did not actually see defendant stab J. At trial, there was also testimony from several other family members, a detective, and an individual who testified about discovering J's body.

using physical force against another may invoke a defense of self-defense. ORS 161.209 - 161.219;[3] *State v. Beisser*, 258 Or App 326, 334, 308 P3d 1121 (2013). When an individual raises the defense of self-defense, the state has the burden to disprove it beyond a reasonable doubt. ORS 161.055(1); *State v. Nebel*, 237 Or App 30, 36, 238 P3d 423, *rev den*, 349 Or 370 (2010). "A factfinder looks to the precise moment in which [the] defendant acted to determine whether the use of deadly force was reasonably necessary, *i.e.*, at the moment he fired the gun." *State v. Butterfield*, 332 Or App 526, 531, 549 P3d 545 (2024) (emphasis, internal quotation marks and citations omitted; brackets in *Butterfield*). The "factfinder," including the trial court in a bench trial, "must weigh (1) whether the defendant reasonably believed that the victim used or threatened to use unlawful physical force against the defendant; and (2) whether the defendant used a degree of force in self-defense that the defendant reasonably believed was necessary." *Id.* at 530. An incorrect application of law by a trial court judge may necessitate reversal. *Id.* at 536-37; *see, e.g.*, *State v. Colby*, 295 Or App 246, 253, 433 P3d 447 (2018) (reversing in a bench trial where the trial court failed to create a sufficient record as to "whether it based its ruling on the correct legal premises").

Here, at the end of trial, the prosecutor framed the entirety of his closing arguments by presenting a theme at the outset—when a "hero *** [t]akes care of himself when

---

[3] ORS 161.209 provides:

"Except as provided in [ORS 161.215 and 161.219], a person is justified in using physical force upon another person for self-defense or to defend a third person from what the person reasonably believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose."

ORS 161.215 provides limitations on the use of force described in ORS 161.209, including but not limited to when the person is the initial aggressor.

ORS 161.219 also provides limitations on the use of force described in ORS 161.209:

"[A] person is not justified in using deadly physical force upon another person unless the person reasonably believes that the other person is:

"(1) Committing or attempting to commit a felony involving the use or threatened imminent use of physical force against a person; or

"(2) Committing or attempting to commit a burglary in a dwelling; or

"(3) Using or about to use unlawful deadly physical force against a person."

somebody threatens or attacks them," lawful and "honorable" self-defense has occurred.[4] The prosecutor asserted that "legitimate self-defense" is a fundamental right and is "actually righteous. It's honorable." The prosecutor repeated that "legitimate" self-defense is "righteous" at least six times.

---

[4] The prosecutor's closing argument included:

"We already know that [] defendant intentionally took the life of [J]. The question before the [c]ourt is, was that killing, was that murder justified? Was it self-defense? And the answer's no.

"The evidence has shown it and the [s]tate has proven it. This is not a self-defense case. And when I talk about self-defense *** and how it comes up in our line of work is there's sort of two sides to it.

"On one hand you have, what I'll call legitimate self-defense. That is when somebody exercises the right that we all have, you have, I have, everyone in this room has, the right to defend themselves appropriately, using the appropriate amount of force from an imminent threat or attack.

"That's a righteous act when that happens. When I say righteous, I don't mean we have a right to do it, therefore, it's righteous. I mean, it's actually righteous. It's honorable. And that's not true of all of our rights.

"For example, I have the right to freedom of speech. That means I can say hateful, disgusting, despicable things. That's not righteous. It might be despicable to say those things. But I have the right. Self-defense is different.

"It's not only a right we have, but it's a righteous thing to do. It's noble. It's honorable to defend yourself. That's what we want. That's why there's self-defense classes everywhere. People should be able to take care of themselves.

"And we have the right to do so. It's what we teach our children. It's what we want people to do. It's what the hero would do in the movie. Takes care of himself when somebody threatens or attacks them. It's honorable.

"There's nothing shameful about it and there's no reason to hide it and there's no reason to lie about it or deny it. And that's what this defendant did. If his act was really self-defense, he wouldn't have spent so much time and energy lying, denying and hiding what he actually did.

"*** [T]here was a legitimate [self-defense] that I just discussed. On the other hand, there's illegitimate claims of self-defense. And that's what I like to call sort of a claim of last resort. And that's when nothing else is working. You can't hide it, you can't deny it.

"When the evidence sort of surrounds you and everything points to your guilt, then that's when people, using it illegitimately, suddenly say, you know what? Okay, okay, okay. I did it. But I was justified. I was using self-defense.

"That's an illegitimate claim of self-defense. And that's what we have in this case. That's what this claim is. It is illegitimate. It's not accurate. This not an act of righteousness, his claim of self-defense. It's a claim of desperation.

"*****

"Again, this is a defense of last resort. As you know, simply saying self-defense is not a[n] automatic get out of jail free card. Just uttering those magic words doesn't give you a license to kill. The law will determine, when somebody claims self-defense, whether or not it's a legitimate claim."

He repeatedly described it as "honorable" and characterized it as "noble" and "what we want people to do."

The prosecutor further emphasized a moral or righteous aspect of self-defense by contrasting the legal right to self-defense against the legal right to free speech. The prosecutor stated,

> "For example, I have the right to freedom of speech. That means I can say hateful, disgusting, despicable things. That's not righteous. It might be despicable to say those things. But I have the right. *Self-defense is different.*"

(Emphasis added.) The prosecutor asserted one additional contrasting quality about the law of self-defense—that "shameful," "illegitimate," or "desperat[e]" conduct cannot be lawful self-defense.

The prosecutor argued that defendant should be convicted on the basis of defendant having a "desperat[e]" and "deprived mind," and that his actions were not "righteous." The prosecutor repeated that argument numerous times throughout the beginning, middle, and end of his closing argument. During the state's rebuttal closing argument, the prosecutor alluded to the dichotomy he created by describing defendant's actions as "disgusting." The prosecutor also described defendant's conduct as a "slaughter," a "murderous, stabbing frenzy."

Unpreserved challenges to comments made by a prosecutor are reviewable utilizing the familiar "plain error" criteria: that it "be an error of law, obvious and not reasonably in dispute, and apparent on the record without having to choose between competing inferences." *State v. Putnam*, 340 Or App 61, 62, 569 P3d 1014, *rev den*, ___ Or ___ (2025) (internal quotation marks and citation omitted). We are tasked with deciding "whether, under the circumstances as a whole, defendant was denied the right to a fair trial, as a matter of law, by the events that transpired at trial." *State v. Chitwood*, 370 Or 305, 312, 518 P3d 903 (2022) (internal quotation marks and citation omitted). Reversal is only warranted when the comments were obviously improper and "so prejudicial as to have denied the defendant a fair trial." *State v. Perez*, 373 Or 591, 598-99, 568 P3d 940 (2025).

We begin by assessing the propriety of the prosecutor's remarks, before turning to the impact on the factfinder. Although the length of a comment is not dispositive, a singular improper remark is more likely to be curable than lengthy or repeated improper arguments. *Compare, e.g.*, *Putnam*, 340 Or App at 66 (determining that although there were several improper statements by the prosecutor, each brief remark could have been stricken), *and State v. Smith*, 334 Or App 89, 92, 554 P3d 817 (2024) (a brief improper remark about "burden of persuasion," in the context of a "lengthy" closing argument during which the prosecutor "referred multiple times to the state having the burden of proof," did not necessitate reversal), *with Chitwood*, 370 Or at 320 (describing the compounding effect of multiple improper remarks), *and State v. Montgomery*, 327 Or App 655, 660, 536 P3d 627, *rev den*, 371 Or 825 (2023) (the prosecutor's "repeated statements" that were improper necessitated reversal). Statements made by a party during argument are reviewed "in context, not in a vacuum." *State v. Mayo*, 303 Or App 525, 530, 465 P3d 267 (2020) (internal quotation marks and citation omitted). Context includes closing arguments as well as the entirety of the trial as a whole. *See Putnam*, 340 Or App at 64 (reviewing "each challenged statement in context of the closing arguments and the trial record as a whole").

As mentioned, in this case, the central dispute at trial was not whether defendant's conduct had occurred, nor whether defendant's conduct was disgusting or not—defendant conceded as much during his own testimony—but whether his actions constituted lawful self-defense. Thus, in context, any argument about the law of self-defense was a central issue.

"[T]he state permissibly may attempt to persuade the [factfinder] that it should believe one version of events and not another." *State v. Purrier*, 265 Or App 618, 620, 336 P3d 574 (2014). "[I]t is always appropriate for a prosecutor to argue from the evidence that the state has met its burden, and to explain why." *Perez*, 373 Or at 617 (Bushong, J., concurring). However, "it is never permissible for a prosecutor

to argue to the jury that the law is anything other than what is contained in the jury instructions."[5] *Id.* at 618.

The prosecutor did not constrain himself to that type of proper argument. He framed his entire closing argument on an extra-legal conception of self-defense: that "righteousness," and "hero[ic],"  "noble" acts are *necessary* components of lawful self-defense.[6] The impropriety of the prosecutor's remarks derives from his misstatement of self-defense law—that behavior he deems righteous is an element of lawful self-defense and that behavior he deems disgusting is preclusive of it.[7] The impropriety of the remarks

_____

[5] In a bench trial, the understanding of applicable law can be clarified "through the offer and acceptance of instructions, as in a jury trial, or through another means that creates a record that explains what law the court applied ***." *Colby*, 295 Or App at 247.

[6] That was an erroneous framing of the legal issue before the court. We are aware of no authority to support an argument that an attorney's personal perceptions of righteousness or disgust are legally relevant to a self-defense determination. Indeed, facts that are capable of constituting lawful self-defense may be regarded by some as "disgusting" but by others as "righteous." Lawful self-defense is bound by "the text and context" of the relevant statutes (ORS 161.209, ORS 161.215, and ORS 161.219). *State v. Sandoval*, 342 Or 506, 510-11, 156 P3d 60 (2007).

In *Sandoval*, the Supreme Court addressed an argument that lawful self-defense required an individual to "'retreat,' 'escape,' or [use] 'other means of avoiding' a deadly confrontation." *Id.* at 511. The court determined that those words do not appear in the statutes and that lawful self-defense is defined "in straightforward terms, [as] a set of circumstances that justify a person's use of deadly force (a reasonable belief that another person is using or about to use deadly force against a person)" and that there are no "additional requirements beyond those circumstances." *Id.*

In other words, personal or subjective characterizations of conduct have no bearing on whether conduct constitutes self-defense. Similarly, "character-based reasoning rather than a focus on the elements of the charged crimes [or defenses]" is "impermissible." *State v. Muniz*, 332 Or App 56, 61, 548 P3d 172, *rev den*, 372 Or 763 (2024).

[7] In our view, although the dissent makes a persuasive argument that defendant's conduct was gruesome—and, therefore, the prosecutor's rhetoric was not inaccurate as a factual matter—the dissent does not meaningfully engage with the prosecutor's mischaracterization of the law of self-defense. 344 Or App at 254-55, 260-62 (Tookey, P. J., dissenting).

Furthermore, had the prosecutor constrained himself to arguing that the evidence supported the state's position and had he interjected only one or two passing remarks contrasting righteous versus disgusting behavior, our analysis would likely result in a different conclusion. However, in the context of this trial and given that the prosecutor wove a misstatement of self-defense law throughout the beginning, middle, and end of his closing argument, we determine that the error requires reversal. *Cf. State v. Durant*, 327 Or App 363, 372, 535 P3d 808 (2023), *rev den*, 374 Or 143 (2025) (declining to reverse on the basis of challenged

may have been further heightened given the "emotionally fraught" context of this case. *State v. Muniz*, 332 Or App 56, 63, 548 P3d 172, *rev den*, 372 Or 763 (2024).

Not only did the prosecutor "divert the [factfinder] from making its determination of guilt or innocence by weighing the legally admitted evidence in the manner prescribed by law[,]" by contrasting the archetype of a heroic self-defender against the deprived mind of a ghoulish person, the prosecutor appealed to "prejudices, fears, or notions of popular sentiment * * *." *State v. Wellington*, 332 Or App 44, 50, 548 P3d 146, *rev den*, 378 Or 81 (2024) (internal quotation marks and citations omitted). Moreover, the prosecutor improperly interjected his personal opinion about defendant's conduct and invited a determination of guilt on that basis—which we deemed reversible in *Muniz*, 332 Or App at 59, 61 ("[I]t was improper for the prosecutor to interject his personal opinion regarding defendant's conduct [as 'disgusting'] * * * [and] to characterize that conduct as demonstrating the 'twisted mind' of the person who [must have committed the crime].").

In *Chitwood*, 370 Or at 316-17, the Supreme Court determined that it was improper for the prosecutor to appeal to "'moral certainty'" and seek a conviction based on an irrelevant circumstance—if the jurors felt the defendant "'should not reside with an adolescent girl.'" Just as the reversible comments in *Chitwood* distorted the law, appealed to moral sensibilities, and invited convictions on the basis of an irrelevant circumstance (in this case, the prosecutor's beliefs about the moral characterization of defendant's conduct), so too did the prosecutor's argument at issue in this case.

We thus conclude that the prosecutor's improper comments were of the nature as those described by the Supreme Court in *Chitwood*: "The bell of misdirection that the prosecutor rang * * *, directing the [factfinder] away from the facts toward emotion and risk of error, was an infringement of defendant's fundamental rights and was a bell that was as difficult to unring as were the bells of misconduct at issue [in two other cases that resulted in reversal]." 370 Or at

---

prosecutor statements that "were brief" and which "the prosecutor immediately transitioned" away from).

320. Had defendant made a motion for mistrial, it would have been error for the trial court to deny the motion. *Id.* at 321.

Having resolved that the prosecutor's closing argument was obviously improper, we turn our analysis to the impact those statements likely had on the factfinder. The state, citing *State v. Miller*, 327 Or App 740, 753-54, 527 P3d 191, *rev den*, 371 Or 715 (2023), argues that the trial court, as factfinder in this case, "'would have been able to disregard' objectionable statements." We recognize that trial courts generally understand that attorneys' arguments are not evidence. *See, e.g.*, *Tiner v. Premo*, 284 Or App 59, 78, 391 P3d 816, *rev den*, 361 Or 886 (2017) ("[S]tatements an attorney makes during closing argument are not evidence."); UCrJI 1005 ("The lawyers' statements and arguments are not evidence."). However, we also observe that all of us are capable, at times, of being swayed by improper appeals to emotion. *See Larsen v. Nooth*, 292 Or App 524, 531, 425 P3d 484 (2018), *rev den*, 364 Or 749 (2019) (James, J., concurring) ("Judges do not become immune to the inherent, unconscious, biases present in the human mind by virtue of their office."); *see also State v. Febuary*, 361 Or 544, 559, 396 P3d 894 (2017) (citing *United States v. Goodwin*, 457 US 368, 377, 102 S Ct 2485, 73 L Ed 2d 74 (1982) for the proposition that institutional bias, subconscious bias, and unconscious bias can be profound and are capable of impacting "judicial response[s]"); *see also State v. Pierce*, 263 Or App 515, 527, 333 P3d 1069, *rev den*, 356 Or 400 (2014) (noting that we review alleged judicial bias "under a realistic appraisal of psychological tendencies and human weaknesses" (internal quotation marks and citation omitted)). Although we think that it is more likely that a trial court judge will be able to disregard improper remarks made by a prosecutor—especially if those remarks are passing comments—than jurors will be, we do not read *Miller* as standing for the proposition that trial court judges can never be swayed by improper argument.

We review the impact an error has on the trial court judge in a bench trial in "context"; reversal is necessary sometimes and not at other times. *State v. Sanchez-Chavez*, 312 Or App 701, 707-08, 495 P3d 197, *rev den*, 369 Or 110 (2021). "[T]he court's speaking verdict and other comments

must be considered in context, taking into account the circumstances in which the court made its observations and the extent to which the court's explanation of its verdict sheds light on how it viewed the evidence." *Id.* We have recognized the persuasive function of oral arguments in bench trials. *See T. L. A. v. Vierra*, 295 Or App 576, 577-78, 435 P3d 826, *rev den*, 364 Or 723 (2019) (discussing that the respondent's closing argument sought to "convince a trial court" "to [not] be persuaded by the evidence" rather than attempting to "convince" the court that the evidence was legally insufficient (emphasis omitted)); *see also State v. Mendoza*, 339 Or App 684, 689, 569 P3d 667 (2025) (determining that reversal was required when a defendant was denied the opportunity to present closing arguments in a bench trial because of their persuasive role and that they may be crucial to correct premature misjudgments); *State v. Barajas*, 247 Or App 247, 249, 268 P3d 732 (2011) (same); *State v. Lovins*, 177 Or App 534, 537-38, 33 P3d 1060 (2001) (reversible error that the trial court indicated that it could make its findings without ever hearing defendant's closing arguments). We have also reversed and remanded for a new trial when "the trial court erred in relying on facts not in evidence (or speculation) when rendering its verdict." *State v. McDougal*, 299 Or App 96, 98, 103-04, 449 P3d 919 (2019). In a bench trial in *State v. Massey*, 249 Or App 689, 690, 694, 278 P3d 130 (2012), *rev den*, 353 Or 203 (2013), the trial court applied the law incorrectly in reaching its guilty verdict, and we rejected an argument from the state that the case should only be remanded for the trial court "to determine, based on the record already adduced, whether defendant was guilty of a DUII"; we determined that reversal and remand for an entirely new trial was appropriate.

During a bench trial, "it is not uncommon for a court *** to instruct itself on the correct version of the law, thereby creating a record that allows us to review whether the court applied the correct principles of law in reaching its verdict." *Colby*, 295 Or App at 252. When improper evidence is included in a bench trial, "in the absence of a statement by the trial court that it did *not* consider [improper testimony], we must conclude that the error was not harmless." *State v. Lopez-Cruz*, 256 Or App 32, 38-39, 299 P3d 569 (2013)

(emphasis in original); *State v. Marrington*, 335 Or 555, 566, 73 P3d 911 (2003) (determining that, when there was nothing in the record to indicate that erroneously admitted testimony "played no role in the trial court's assessment," the error was not harmless).

We recognize that the impropriety in this case was the result of impermissible argument by the prosecutor, rather than improperly admitted evidence. However, the impermissible argument contained repeated and egregious misstatements of the law. The trial court did not instruct itself on the law it was applying on the record, nor did the trial court disclaim the misstatement of law argued by the prosecutor. As previously explained, whether defendant acted consistent with lawful self-defense was the central issue of the trial. *See Montgomery*, 327 Or App at 660 (determining that reversal was appropriate when "[t]he state's case *depended* on which version of events the jury found to be true," the prosecutor repeatedly engaged in impermissible vouching, and "the jury might have been tempted to evaluate the witnesses' credibility on that basis rather than on the evidence" (emphasis added)).

We think it noteworthy that the prosecutor's use of the terms "noble," "hero[ic]," and "shameful" risk confusion of the factfinder, the task of which is to determine whether the state has proved that the degree of force with which defendant responded was not reasonable. Whether the defendant deserved to feel noble or heroic about his actions or behaved as if he was ashamed of his reaction to the threat of force or force used upon him play no part in the ORS 161.209 test. One can easily imagine a person with a strong defense wanting to avoid suspicion and criminal prosecution, especially if that person has had or witnessed past negative experiences with the justice system.

We must decide whether to exercise our discretion to correct a plain error. *State v. Ortiz*, 343 Or App 37, 40, ___ P3d ___ (2025). Because, as analyzed above, we believe the improper argumentation denied defendant the opportunity to have his case fairly decided, we determine that "'the competing interests of the parties, * * * the gravity of the error, the ends of justice in [this] particular case * * * [and that] the

trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error'" favor our exercise of discretion to correct the error. *Id.* at 43 (quoting *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991) (providing a nonexclusive list of factors we may consider with regard to exercising our discretion to correct plain error)). The state has no valid interest in securing a conviction on an improper basis, *see, e.g.*, *State v. Capri*, 248 Or App 391, 397, 273 P3d 290 (2012) (correcting a plain error with regard to sentencing because the state has no legitimate interest in having a defendant serve an unlawful sentence), and defendant has a strong interest in ensuring he is not convicted on an improper basis, *see Ortiz*, 343 Or App at 43-44 (the defendant "has a strong interest in ensuring that she is not convicted of a crime, based, in part, on inadmissible *** evidence"). Cases involving clearly improper prosecutorial comments have routinely resulted in plain error reversal both from our court and the Supreme Court. *See, e.g.*, *Chitwood*, 370 Or at 329 (concluding that "the ends of justice require that we exercise our discretion to correct the error and reverse [the] defendant's convictions" (internal quotation marks omitted)); *Muniz*, 332 Or App at 63 (same).

The dissent follows the prosecutor's theme, urging that "legitimate self-defense" is an argument from the evidence and therefore not improper. 344 Or App at 254-55 (Tookey, P. J., dissenting). Once raised, self-defense is legitimate until the state proves that it is not. *State v. Dahrens*, 192 Or App 283, 287, 84 P3d 1122 (2004) ("A proper self-defense instruction [explains] that self-defense has been raised, gives *** the appropriate standard for analyzing the self-defense claim, and informs the [factfinder] that the burden of proof is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense."). We emphasize that our holding in this case is based on the specific contours of the record before us, including that the prosecutor's improper remarks colored the entirety of the state's closing arguments, that the trial court did not instruct itself on the law it was applying, and that the trial court did not disclaim reliance on the state's improper argument or otherwise make clear that it was rejecting an improper view of

the law. We conclude that defendant was denied the opportunity to have his case fairly decided on the merits.

Conviction on Count 1 reversed and remanded; remanded for resentencing; otherwise affirmed.

**TOOKEY, P. J.,** dissenting.

Defendant was convicted after a bench trial. In a bench trial, absent evidence to the contrary, we usually understand trial courts to know and apply the relevant legal standard. *See State v. Miller*, 327 Or App 740, 753, 537 P3d 191, *rev den*, 371 Or 715 (2023) (observing that, in bench trials, we generally assume that trial judges are able to disregard improper comments if the defendant had objected, and "[i]t will be the rare case in which an improper statement made by an attorney in closing argument to the court is so prejudicial that the court is legally required to declare a mistrial"). Indeed, on appeal, we require appellants to establish that there *was* trial court error rather than requiring respondents to establish that there *was not*. That is, the burden of establishing error is on the appellant—here, that is defendant.

Notwithstanding that framework, in this case, which is in a plain-error posture, the majority reverses after a bench trial under the principles articulated in *State v. Chitwood*, 370 Or 305, 518 P3d 903 (2022). This case is the first time that we have reversed in a bench trial on *Chitwood* grounds.

The majority holds that defendant did not receive a fair trial because of comments about the law of self-defense made by the prosecutor. But neither defendant nor the majority make a solid case—*i.e.*, one supported by the record rather than speculation—that the trial court actually misunderstood the law of self-defense. Appellant has not established reversible error—much less *plain error*.

According to the majority, the prosecutor's description of legitimate self-defense as "righteous," "honorable," "heroic," and "noble," would have suggested to the trial court that those terms are "*necessary* components of lawful self-defense," and that "behavior he deems righteous is an

element of lawful self-defense and that behavior he deems disgusting is preclusive of it." 344 Or App at 247-48. Those contentions misconstrue the prosecutor's argument, and the record does not support the speculative conclusion that the trial court misunderstood the law of self-defense.

"[O]nce self-defense has been raised by a defendant, the state has the burden of disproving it beyond a reasonable doubt." *State v. Oliphant*, 347 Or 175, 190-91, 218 P3d 1281 (2009) (citing ORS 161.055). "To determine whether the state has met that burden, a factfinder must weigh (1) whether the defendant reasonably believed that the victim used or threatened to use unlawful physical force against the defendant; and (2) whether the defendant used a degree of force in self-defense that the defendant reasonably believed was necessary." *State v. Butterfield*, 332 Or App 526, 530-31, 549 P3d 545 (2024) (internal quotation marks omitted).

Here, the state had the burden to prove defendant did not act in self-defense, so it was permissible for the prosecutor to raise the question of why defendant hid the body and lied about killing J. That was circumstantial evidence that defendant did not reasonably believe that his use of deadly force was necessary. In other words, it was an argument about why the right to self-defense did not apply based on the evidence of the extraordinary steps defendant took to conceal his killing of J.

That is the context in which we must evaluate the prosecutor's argument about legitimate self-defense, which the prosecutor described as "a righteous act," "honorable," "heroic," and "noble." The prosecutor's point was that "[t]here's nothing shameful about" legitimate self-defense, "and there's no reason to hide it and there's no reason to lie about it or deny it. And that's what this defendant did. If his act was really self-defense, he wouldn't have spent so much time and energy lying, denying and hiding what he actually did."

The evidence shows that defendant *did* take extraordinary steps to hide the fact that he had killed J, and he *did* subsequently lie about it.

It may have been ill-advised for the prosecutor to use the terms "righteous," "honorable," "heroic," and "noble" to describe legitimate self-defense, but his argument that there is nothing shameful about legitimate self-defense was an argument based on the evidence, so it was not obviously improper. In his closing argument, the prosecutor did not walk through the elements of the law of self-defense, which the prosecutor might have chosen to do if the trial had been a jury trial. Instead, at the end of this bench trial, the prosecutor made a more general argument about why defendant's conduct after the killing—which included hiding the body, dismembering it, lying to police, and denying he had killed the victim—cast doubt on defendant's belated claim to have acted in self-defense. In my view, that argument was not obviously improper. *See State v. Sperou*, 365 Or 121, 130, 442 P3d 581 (2019) (explaining that prosecutors "have wide latitude to make *arguments* from the evidence" (emphasis in original)); *see also State v. Slay*, 331 Or App 398, 404, 545 P3d 768, *rev den*, 372 Or 560 (2024) ("Advocacy * * * would be nearly impossible if attorneys were not able to comment on a witness's credibility, provided that their argument is grounded in the evidence in the record.").

The majority argues that the prosecutor's argument was improper because it "appealed to 'prejudices, fears, or notions of popular sentiment,'" and "the prosecutor improperly injected his personal opinion about defendant's conduct." 344 Or App at 247. Although arguments of that nature are often a cause for concern in jury trials, in which lay jurors are less familiar with the practice of applying the law to the facts, they are less likely to cause mischief in a bench trial. Here, "the trial judge would have been able to disregard those statements if defendant had objected." *Miller*, 327 Or App at 753. As I explain below, this case is not one in which the prosecutor's closing argument to the court was "so prejudicial" that the court was "legally required to declare a mistrial." *Id*.

In a bench trial, "the court determines both the law and the facts." *State v. Colby*, 295 Or App 246, 249, 433 P3d 447 (2018). In a jury trial, the parties submit proposed jury instructions, and the court decides which ones to use,

but "it is often not as clear from the record in bench trials what principles of law the factfinder applied to the facts with respect to the charged offense." *Id.* at 249-50. "[I]n a bench trial there is no fixed procedural means of preserving a challenge to the trial court's determinations as to the elements of a crime, nor is a trial court required to express its ruling in a particular way." *Id.* at 251. At the same time, to facilitate meaningful appellate review, "a court cannot refuse to disclose the legal principles that it has applied in construing the elements necessary to adjudicate guilt, *when a defendant properly raises that issue*." *Id.* (Emphasis added.)

Here, defendant did not preserve the issue he raises on appeal, and he seeks plain-error review. An error is plain when the error is "(1) an error of law; (2) obvious, not reasonably in dispute; and (3) apparent on the record, meaning that the appellate court must not need to go outside the record to identify the error or choose between competing inferences, and the facts constituting the error must be irrefutable." *State v. Wiltse*, 373 Or 1, 10, 559 P3d 380 (2024) (internal quotation marks omitted). Whether a trial court erred by giving an instruction in a jury trial "is something that can be determined based on the instruction itself." *Id.* at 4.

The record does not contain a copy of the instructions that defendant provided to the trial court on the law of self-defense. Nevertheless, we know that defendant *did* provide instructions to the court. At the beginning of his closing argument, one of defendant's attorneys indicated that he was "looking through the self-defense law we gave the Court," and the trial court stated on the record that it had read the instructions.

In response to the prosecutor's argument about legitimate self-defense being honorable, righteous, or noble, defense counsel argued as follows:

"[DEFENSE COUNSEL]: Thank you. So I won't be—I'll try to not be redundant. But as I look through there, I don't find the word honorable. I don't find the word righteous. And I—I'm somewhat appalled by the State's argument. I find it repugnant, quite frankly.

"Would it make it honorable if he changed his skin color?

"* * * * *

"[DEFENSE COUNSEL]:   Would it make it honorable? Would it make it righteous? Those words aren't in here. The law applies equally, Your Honor. At least, that's the way I read it. That's my understanding. I've been practicing for a little while.

"And I look at the law. The law says in self-defense, a person's justified, justified in using deadly physical force upon another person if he reasonably believes—not knows, not is actually sure—if he reasonably believes the other person is using or about to use unlawful deadly physical force upon himself.

"That's what the law says, period. No honorable in there, no righteousness in there. It's self-defense, period. He's entitled to that right, the same as everyone in this courtroom. We're all entitled to that."

Based on that exchange, we can reasonably infer that the written instructions *did not* state that acting righteously or honorably were "elements" of the law of self-defense. Nevertheless, the majority speculates that the prosecutor's argument might have caused the trial court to misunderstand the law of self-defense. Given defense counsel's argument and the trial court's statement that it had reviewed the instructions, it is more reasonable to infer the opposite: that the prosecutor's argument did not distract the trial court from correctly applying the law of self-defense.[1] In any event, because the record on appeal does not contain a copy of the written instructions on self-defense, it is neither obvious, nor apparent on the record, that the trial court incorrectly applied the law of self-defense. *See State v. Gornick*, 340 Or 160, 169-70, 130 P3d 780 (2006) (no plain error when the error is not apparent on the record and requires choosing between competing inferences).

In explaining the verdict, the trial court did not use the words "righteous," "honorable," "heroic," or "noble" to

---

[1] Defense counsel's closing argument, in which he argued that the words "honorable" or "righteous" were not part of the law of self-defense, undercuts the majority's reliance on cases in which the defendant in a bench trial was prevented from making *any* closing argument. 344 Or App at 250.

describe the law of self-defense. *See State v. Sanchez-Chavez*, 312 Or App 701, 708-09, 495 P3d 197 (2021) (in a bench trial, the trial court did not mention contested evidence in its speaking verdict, and "in context, we understand that omission to mean that the court did *not* consider those statements significant to its findings" (emphasis in original)). Instead, the speaking verdict indicates that the trial court was focused on the appropriate elements; namely, whether defendant reasonably believed that the circumstances justified the use of deadly force against J, and whether defendant used a degree of force that he reasonably believed was necessary. *See Butterfield*, 332 Or App at 530-31 (describing the elements of self-defense). The trial court acknowledged that J was not supposed to be in the apartment, that he had been asked to leave but did not comply, and that defendant may have been "suspicious of the police" and concerned he would not get "a fair shake" if he reported his killing of J to the police. However, with respect to the fight between defendant and J, the trial court noted that the evidence showed that defendant hit J with a gun "hard enough to break his skull." The trial court pointed to the conflict between defendant's testimony and that of his brother: "And your testimony is that he came at you with a knife and then you had to wrestle him for it. Your brother's testimony as he came out of the room and saw him there on the ground, bleeding profusely from his head and crying." The trial court questioned whether J could "continue a vigorous fight" given the injury to his head.

Turning to the photographs of the knife wounds, the court found that the wounds did not appear to be "defensive wounds." Instead, "I've got some very deliberate wounds to the abdomen, neck on both sides." The court pointed out there were "22 specific wounds and * * * they're not small paper cuts * * *. They're significant wounds." The trial court continued:

> "And here's where I come down. I credit [defendant's brother's] testimony that he saw [J] trying to get to the door and leave. Because the wounds, the two stab wounds on the buttock are consistent with walking up behind him and stabbing him.

"* * * These are not accidental injuries. There was an intent to cause severe and grievous bodily harm. I think the State has overcome, by a reasonable doubt—I don't have any doubt. I mean, this was a slaughter.

"I think likely he was completely incapacitated with the head wound or minimal resistance. But nothing in this rises to the level of self-defense. A murderous stabbing frenzy, 22 separate wounds is not five or six of stabbing someone in a fight where you're keeping them off."

That speaking verdict does not suggest that the trial court believed that righteous, honorable, heroic, or noble conduct were elements of the law of self-defense. Nor does it suggest that the trial court believed it could find defendant acted in self-defense only if defendant felt "noble or heroic about his actions" or if defendant was not "ashamed of his reaction to the threat of force." 344 Or App at 251. Instead, in determining that the state met its burden to show that defendant did not reasonably believe that the circumstances justified the use of deadly force against J, the trial court relied on evidence that J was on the ground bleeding and crying and trying to leave when defendant stabbed him from behind. In determining that the state met its burden to show that defendant did not reasonably believe the use of deadly force was necessary, the trial court pointed to the evidence regarding the nature and extent of J's wounds. Thus, in its speaking verdict, the trial court explained how the evidence supported its conclusion that defendant did not act in self-defense.

According to the majority, the trial court was required to do more: even though defendant did not object to the prosecutor's closing argument, the majority expresses concern that the "trial court did not instruct itself on the law it was applying on the record, nor did the trial court disclaim the misstatement of law argued by the prosecutor." 344 Or App at 251. But, as noted earlier, we require appellants to establish that there *was* trial court error rather than requiring respondents to establish that there *was not*.

The majority argues that the prosecutor's closing argument risked confusing the factfinder, and that "[o]ne can easily imagine a person with a strong defense wanting

to avoid suspicion and criminal prosecution especially if that person had or witnessed past negative experiences with the justice system." 344 Or App at 251. But, in its speaking verdict, the trial court expressly acknowledged that defendant may have been suspicious of the police. Focusing on the record made by the trial court, it provides no clear basis to think the trial court was confused about the relevant legal standard, so defendant has not met his burden of showing plain error.

The majority suggests that prosecutors cannot appeal to "moral sensibilities." 344 Or App at 248. In so arguing, the majority relies on *Chitwood*, in which the Supreme Court determined that the prosecutor's argument that the jury could convict the defendant if it found that he "should not reside with an adolescent girl" was improper because it "appealed to the jurors' moral sensibility about an irrelevant circumstance." 370 Or at 316, 317. Although under *Chitwood* it would be improper for a prosecutor to invite the factfinder to convict a defendant based on moral feelings or sentiments alone, here I do not view the prosecutor's argument or comments as having crossed that line. Instead, the prosecutor relied on the evidence and pointed out facts that had been established during the trial—that J was on the floor bleeding and crying after being hit in the head with defendant's gun, that J was trying to leave when defendant stabbed him from behind, that J suffered 22 stab wounds, that defendant hid the body, lied to the police, and denied involvement in the killing—all of which supported the state's position that defendant had not acted in self-defense.

According to the majority, the prosecutor's closing argument contrasted "the archetype of a heroic self-defender against the deprived mind of a ghoulish person." 344 Or App at 248. True, the prosecutor described defendant as having "a deprived mind" and as having gone to "ghoulish lengths" to hide the fact that he had killed J. But let's not forget that defendant drained the body of blood in a bathtub, buried it in the backyard of his apartment complex, later dug it up, partially dismembered it, and then hid the body parts in the crawl space of a nearby house. Let's also not forget that defendant repeatedly lied to the police, showed no remorse

in jail house calls, and suggested to the police that one of the other persons who helped to clean up the apartment may have killed J. Considered in that context, the prosecutor's arguments were not obviously improper, and there is no clear indication that they unduly swayed the trial court, which was quite measured in its assessment of the evidence in its speaking verdict.

Even if we assume that the prosecutor's description of "legitimate" self-defense was obviously improper, the comments provide grounds for reversal only if they "rendered the defendant's trial unfair, which *** requires the defendant to show that any curative instruction by the trial court would not have been effective." *State v. Perez*, 373 Or 591, 606, 568 P3d 940 (2025). But how is that supposed to work in a bench trial? Is it sufficient for trial courts to think to themselves that they will disregard obviously improper argument, or are they required to make a record of having done so, even absent any objection from defense counsel? The majority requires the latter when it points out that, even without an objection, the trial court should have instructed itself on the law it was applying or disclaimed reliance on the prosecutor's argument. In my view, that is an unworkable rule. Imposing that requirement on trial courts underscores why the *Chitwood* framework does not easily apply in bench trials, which is perhaps why we have never previously reversed on *Chitwood* grounds in a bench trial.

Because I would reject defendant's fifth assignment of error, I briefly address the others. I agree with the majority that the trial court did not err in denying defendant's motions for a judgment of acquittal because the evidence was sufficient for a rational factfinder to conclude that defendant did not act in self-defense. *State v. Cox*, 329 Or App 228, 235, 540 P3d 36 (2023). Nor did the trial court plainly err in its speaking verdict because it is not obvious or beyond reasonable dispute that the trial court relied on facts not in evidence. When describing the victim's head injuries and their likely effect, the trial court drew on its own experience, but it is not obvious that the trial court substituted its experience for the evidence.

Considering the gruesome nature of the crime and the steps taken to conceal it, I am not persuaded that the prosecutor's comments and arguments were obviously improper. And the record in this bench trial does not support the majority's claim that they were so improper as to have deprived defendant of a fair trial. In my view, the trial court did not plainly err when it did not make a record of having instructed itself on the law of self-defense or disclaim reliance on the prosecutor's argument, and I would not exercise my discretion to correct the error, if any.

I would affirm the judgment of conviction, and I respectfully dissent.